1  W. Scott Holleman (#310266)
2  Melissa A. Fortunato (# 319767)
   **BRAGAR EAGEL & SQUIRE, P.C.**
3  580 California Street, Suite 1200
   San Francisco, California 94104
4  Telephone: (415) 568-2124
   Email: holleman@bespc.com
5          fortunato@bespc.com

6

7  *Counsel for Plaintiff*

8

9              **UNITED STATES DISTRICT COURT**
           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10                **SAN FRANCISCO DIVISION**

11

12                                          Case No. 4:20-cv-01088-JSW

13  IN RE NEKTAR THERAPEUTICS
    DERIVATIVE LITIGATION
14                                          **VERIFIED CONSOLIDATED**
                                            **STOCKHOLDER DERIVATIVE**
15                                          **COMPLAINT**

16  This filing relates to:
                                            **DEMAND FOR JURY TRIAL**
17  ALL ACTIONS

18

19

20

21

22

23

24

25

26

27

28
    _____
         VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Allison Hunt and Gail Becker (together, "Plaintiffs"), by and through their counsel, derivatively on behalf of nominal defendant Nektar Therapeutics ("Nektar" or the "Company"), submit this Verified Consolidated Stockholder Derivative Complaint ("Complaint") against certain current and former officers and directors of the Company (collectively defined herein as the "Individual Defendants"), and allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings submitted by Nektar to the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Nektar; (iii) securities class action lawsuits filed in the United States District Court for the Northern District of California captioned *In re Nektar Therapeutics Securities Litigation*, No. 4:18-cv-06607-HSG (N.D. Cal.); and *Damiba v. Nektar Therapeutics*, No. 4:19-cv-05173-JSW (N.D. Cal.) (collectively, the "Securities Class Actions"); and (iv) other publicly available information, including court filings and media and analyst reports, concerning Nektar.

## SUMMARY OF THE ACTION

1.     This is a stockholder derivative action asserting claims for breach of fiduciary duty, violations of Section 14(a) of the Securities Exchange Act (the "Exchange Act"), and misappropriation of information, brought on behalf of nominal defendant Nektar, against the Individual Defendants. Plaintiffs seek to remedy the Individual Defendants' violations of state and federal laws from January 10, 2017 to August 8, 2019 (the "Relevant Period") that have caused and continue to cause substantial monetary damages to Nektar and other damages, including damages to its reputation and goodwill.

2.     Nektar is a biopharmaceutical company that specializes in the research, discovery, and development of novel medications for areas in which there is sizeable unmet medical need. Nektar's pipeline includes new investigational drugs for treatment and use in a variety of medical areas including cancer, chronic pain, and autoimmune disease. In its public filings, Nektar purports to leverage its proprietary chemistry platform to develop new drug candidates which utilize the

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

Company's advanced polymer conjugate technology platforms, designed to allow the "development of new molecular entities that target known mechanisms of action."

3. Nektar's lead immuno-oncology candidate is NKTR-214, also known as bempegaldesleukin or bempeg. It is a biologic substance designed to stimulate proliferation and growth of tumor-killing immune cells.

4. According to the Company's President and Chief Executive Officer ("CEO"), defendant Howard W. Robin ("Robin"), IL-2 is a "[m]aster [g]rowth [f]actor for T Cells and Natural Killer (NK) Cells." However, the safety profile of IL-2 has limited its usage as an effective cancer therapy. IL-2's short half-life requires high doses of the protein for effectiveness, and while IL-2 prompts the production of cancer-killing cells, it also triggers the production of "Treg" cells, which are immunosuppressive. As such, IL-2 presents challenges with toxicity when given in high doses. NKTR-214, through utilizing IL-2, is designed to stimulate and facilitate the growth of "tumor-killing immune cells." Specifically, NKTR-214 was created as a modified form of IL-2, to proliferate the production of cancer-killing cells, without triggering the production of immunosuppressive cells.

5. The Company has conducted a number of clinical trials evaluating the efficacy of NKTR-214, including the in-human multicenter phase 1 study titled, EXCEL. During the Relevant Period, the investing public was led to believe that NKTR-214 successfully achieved what IL-2 could not on its own: the proliferation of cancer-fighting cells in tumors without the concurrent increase in immunosuppressive cells. Specifically, the initial results achieved in EXCEL were negative, yet, the results reported by the Company to the market were skewed due to a drastic increase in the cancer-fighting cells experienced in one of the five patients participating in the trial, rendering the initial results of the study significantly (and misleadingly) positive. Nevertheless, the Individual Defendants caused the Company to repeatedly and publicly tout the study's false results, over 10 times, flaunting that NKTR-214 produces a "30-fold increase," or produces 30 times the number of cancer-fighting cells with negligible increase in immunosuppressive cells.

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

6.      Moreover, the Company's claims pertaining to the supposed 30-fold increase produced by NKTR-214 misrepresented additional information that further rendered the statements false and misleading to the investing public.  In addition to intentionally utilizing outlier data from a single patient, the Individual Defendants caused the Company to falsely report the size and composition of the data set, as well as the dosing schedule used in the EXCEL trial.

7.      To further develop NKTR-214 as a commercial cancer therapy, the Company initiated the PIVOT-02 clinical study to evaluate the benefit, safety, and tolerability of combining NKTR-214 with Opdivo, an antibody, in collaboration with Bristol-Myers Squibb Company ("Bristol-Myers" or "BMS").

8.      The Company announced the initial results of PIVOT-02 in November 2017, which the market reacted to favorably, resulting in an increase in the price of Nektar common stock.  Soon after, in February 2018, the Company announced a collaboration agreement between BMS and Nektar to further analyze the combination of Opdivo and NKTR-214, with BMS providing the Company almost $2 billion upfront in cash and equity.  Yet, similar to EXCEL, unbeknownst to the investing public, certain of the Individual Defendants were aware and/or actively engaged in manipulating the PIVOT-02 trial by, *inter alia*, presenting patient data that was unvalidated, prioritizing the presentation of positive results, and delaying less positive results, all of which ran contrary to industry standards and painted a false image of NKTR-214's success that was not sustainable long-term.

9.      Indeed, on June 2, 2018, the Company issued a press release concerning preliminary data from the ongoing PIVOT-02 trial.  The press release revealed a significant drop in the treatment's efficacy, from a previous response rate of 85% in stage 1 of the study to a mere 50%.  The results from the PIVOT-02 trial were deemed by news outlets to be both "confusing" and "disappointing" given the Company's previously touted string of success.  On this news, the price per share of Nektar stock plummeted approximately 41.82% from the previous day's closing price of $90.35 on June 1, 2018, to close at $52.57 on June 4, 2018.

10.     The truth continued to emerge on October 1, 2018, when a detailed report published by short-seller Plainview LLC ("Plainview") titled, "NKTR-214: Pegging the Value at Zero" (the "Report"), revealed that while the Company had touted NKTR-214 as a promising new cancer treatment drug, Nektar had only disclosed about 31% of response rates and withheld the rest of the data on dosed patients in its PIVOT study as of its presentation at the 2018 American Society of Clinical Oncology ("ASCO") annual meeting, where the Company discussed its PIVOT phase 1/2 results. The Report maintained that the Company's hypothesis that "pegylating," *i.e.*, adding polyethylene glycol molecules to, IL-2 would improve IL-2's function did not prove to be true.

11.     The Report further stated that pegylation actually impaired the efficacy of NKTR-214, making it an ineffective cancer treatment. The Report noted that the Company's frequent reference to a "30-fold average change" was due to a single outlier patient that had experienced drastic results, distorting the study's numbers, and categorized the statement as "Brazenly Misleading." The Report contained a link to the obscured data, buried in a clinical poster by Nektar from a European presentation that revealed that prior statements made about NKTR-214 were false. Lastly, the Report emphasized that the combination of NKTR-214 with Opdivo had not established meaningfully positive results and that IL-2 on its own was more effective than NKTR-214.

12.     On this news, the price per share of Nektar stock fell over the next two trading sessions, from a closing price of $60.96 on September 28, 2018, to a closing price of $56.65 on October 1, 2018, a decline of approximately 7%, and further fell to a closing price of $55.33 on October 2, 2018.

13.     Then, in late 2019, another disclosure revealed that the Company was not only engaged in substandard industry practices during its EXCEL and PIVOT-02 trials, but it also failed to comply with good manufacturing practices in its PIVOT-02 trials, implicating the vital study's clinical results.

14.     On August 8, 2019, the Individual Defendants revealed that a manufacturing issue caused two batches of NKTR-214 to differ from the other twenty batches that were produced. Moreover, these batches resulted in variable clinical benefit from other batches used in the

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

Company's PIVOT-02 clinical trial. On this news, the price of Nektar stock nosedived 30%, or $8.65, to close at $20.92 per share the next day on an unusually heavy trading volume.

15. Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants committed securities fraud by : (1) knowingly including outlier data that skewed the trial results; (2) claiming the data set consisted of ten patients, when it consisted of five; (3) falsely implying that NKTR-214 selectively proliferated cancer-killing cells in the same patients that experienced negligible increases of immunosuppressive cells, when those results occurred in different groups of patients; (4) stating that the dosing schedule was every 3 weeks, when a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (5) Nektar and Bristol-Myers had decided to reduce the number of indications for which U.S. Food and Drug Administration ("FDA") approval would be sought; (6) the Company did not comply with current good manufacturing practices; (7) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (8) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (9) as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (10) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

16. Finally, during the Relevant Period, certain of the Individual Defendants negligently issued a materially false and misleading proxy statements urging stockholders to reelect certain directors under false pretenses.

17. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Nektar has sustained damages as described below.

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

## JURISDICTION

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

19.     Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because nominal defendant Nektar is headquartered in this District.  In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

23.     Plaintiff Allison Hunt is currently a Nektar stockholder and has continuously been a stockholder of the Company since at least January 2019.

24.     Plaintiff Gail Becker is currently a Nektar stockholder and has continuously been a stockholder of the Company since at least April 2018.

25.     Nominal defendant Nektar is incorporated under the laws of the State of Delaware and maintains its headquarters at 455 Mission Bay Boulevard South, San Francisco, California 94158.  The Company's shares are publicly traded on the NASDAQ under the symbol "NKTR".

26.     Defendant Robin has served as the Company's President and since January 2007.  Defendant Robin also has served as a director of the Board since February 2007.  According to filings with the SEC, defendant Robin received $13,330,667 in compensation from the Company in 2018.  Defendant Robin is named as a defendant in the Securities Class Actions.  Defendant Robin sold the following shares with insider information regarding the Company's market manipulation,

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| January 17, 2017 | 87,500 | $12.35 | $1,080,625 |
| February 8, 2017 | 87,500 | $13.04 | $1,141,000 |
| February 16, 2017 | 8,636 | $13.14 | $113,477 |
| May 16, 2017 | 8,388 | $19.55 | $163,985 |
| August 16, 2017 | 91,714 | $19.29 | $1,769,163 |
| September 6, 2017 | 83,333 | $21.54 | $1,794,992 |
| October 9, 2017 | 83,333 | $24.20 | $2,016,658 |
| November 1, 2017 | 83,334 | $23.57 | $1,964,182 |
| December 13, 2017 | 83,333 | $55.69 | $4,640,814 |
| January 22, 2018 | 83,333 | $75.82 | $6,318,308 |
| February 16, 2018 | 12,788 | $82.94 | $1,060,636 |
| May 1, 2018 | 43,334 | $93.65 | $3,624,889 |
| May 2, 2018 | 43,333 | $85.63 | $3,710,604 |
| May 3, 2018 | 43,333 | $82.86 | $3,590,572 |
| May 16, 2018 | 12,791 | $83.39 | $1,066,641 |
| June 25, 2018 | 43,334 | $51.82 | $2,245,567 |
| June 26, 2018 | 43,333 | $49.36 | $2,138,916 |
| June 27, 2018 | 43,333 | $47.39 | $2,053,550 |
| February 19, 2019 | 42,215 | $42.36 | $1,787,805 |
| February 20, 2019 | 33,334 | $43.20 | $1,440,028 |
| February 21, 2019 | 33,333 | $41.01 | $1,366,986 |
| May 16, 2019 | 13,383 | $21.37 | $285,994 |
| May 21, 2019 | 33,333 | $32.93 | $1,097,655 |
| May 22, 2019 | 33,334 | $33.38 | $1,112,688 |
| May 23, 2019 | 33,333 | $32.69 | $1,089,655 |
| July 23, 2019 | 33,333 | $32.10 | $1,069,989 |
| July 24, 2019 | 33,334 | $32.11 | $1,070,354 |
| July 25, 2019 | 33,333 | $29.65 | $988,323 |
| **Total Shares** | **1,308,248** | **Total Proceeds** | **$51.8 million** |

27. Defendant Gil M. Labrucherie ("Labrucherie") has served as Nektar's Senior Vice President and Chief Financial Officer since June 2016. According to the Company's public filings with the SEC, defendant Labrucherie received $5,733,928 in compensation from the Company in

2018. Defendant Labrucherie is named as a defendant in the Securities Class Actions. Defendant Labrucherie sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| February 16, 2017 | 2,359 | $13.14 | $30,997 |
| March 2, 2017 | 167,506 | $15.15 | $2,537,715 |
| March 3, 2017 | 32,494 | $15.21 | $494,233 |
| May 16, 2017 | 3,179 | $19.55 | $62,149 |
| August 16, 2017 | 3,177 | $19.32 | $61,379 |
| October 2, 2017 | 120,000 | $24.45 | $2,934,000 |
| February 16, 2018 | 3,477 | $82.94 | $288,382 |
| May 1, 2018 | 30,000 | $83.65 | $2,509,500 |
| May 2, 2018 | 30,000 | $85.63 | $2,568,900 |
| May 3, 2018 | 30,000 | $82.86 | $2,485,800 |
| May 16, 2018 | 4,941 | $83.39 | $412,029 |
| May 16, 2019 | 3,767 | $31.37 | $118,170 |
| June 17, 2019 | 25,000 | $33.71 | $842,750 |
| July 10, 2019 | 25,000 | $34.57 | $864,250 |
| **Total Shares** | **480,900** | **Total Proceeds** | **$16.2 million** |

28. Defendant Stephen K. Doberstein ("Doberstein") has served as the Company's Chief Research and Development Officer since January 2010. According to the Company's filings with the SEC, defendant Doberstein received $4,811,856 in compensation from the Company in 2018. Defendant Doberstein sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| February 16, 2017 | 1,261 | $13.14 | $16,569 |
| April 5, 2017 | 100,000 | $21.70 | $2,170 |
| May 16, 2017 | 1,701 | $19.55 | $33,254 |
| August 16, 2017 | 1,701 | $19.32 | $32,863 |
| October 5, 2017 | 43,677 | $24.97 | $1,090,614 |

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

| November 6, 2017 | 20,914 | $24.98 | $522,431 |
| November 7, 2017 | 75,109 | $25.78 | $1,944,044 |
| November 8, 2017 | 300,000 | $30.09 | $9,027,000 |
| February 16, 2018 | 2,426 | $82.94 | $201,212 |
| April 6, 2018 | 110,500 | $91.69 | $10,131,745 |
| April 9, 2018 | 49,500 | $96.13 | $4,758,435 |
| May 16, 2018 | 3,435 | $83.39 | $286,444 |
| February 19. 2019 | 3,310 | $42.39 | $140,310 |
| **Total Shares** | **713,834** | **Total Proceeds** | **$30.3 million** |

29.     Defendant Ivan P. Gergel ("Gergel") was Nektar's Chief Medical Officer from 2014 until his resignation on December 2017. Defendant Gergel sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
| --- | --- | --- | --- |
| July 11, 2017 | 8389 | $21.04 | $176,504 |
| July 12, 2017 | 36691 | $21.09 | $773,813 |
| July 18, 2017 | 54920 | $21.10 | $1,158,812 |
| August 16, 2017 | 1997 | $19.32 | $38,582 |
| September 29, 2017 | 43296 | $24.04 | $1,040,835 |
| October 2, 2017 | 56704 | $24.21 | $1,372,803 |
| **Total Shares** | **201,997** | **Total Proceeds** | **$4.5 million** |

30.     Defendant John Nicholson ("Nicholson") served as Nektar's Senior Vice President and Chief Operating Officer from June 2016 until his retirement in October 2019. Defendant Nicholson sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
| --- | --- | --- | --- |
| February 2, 2017 | 66,495 | $12.38 | $823,208 |
| February 2, 2017 | 8,505 | $12.48 | $106,142 |
| February 16, 2017 | 3,237 | $13.14 | $42,534 |
| May 16, 2017 | 3,146 | $19.55 | $61,504 |

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

| | | | |
|---|---|---|---|
| June 7, 2017 | 101,700 | $19.24 | $1,956,708 |
| August 16, 2017 | 3,177 | $19.32 | $61,379 |
| November 13, 2017 | 15,910 | $37.78 | $601,079 |
| February 16, 2018 | 4,879 | $82.94 | $404,664 |
| March 6, 2018 | 120,000 | $98.29 | $1,179,800 |
| March 7, 2018 | 100,144 | $100.45 | $10,059,464 |
| May 16, 2018 | 4,917 | $83.39 | $410,028 |
| February 19, 2019 | 3,822 | $42.39 | $162,014 |
| May 16, 2019 | 4,077 | $31.37 | $127,895 |
| **Total Shares** | **440,009** | **Total Proceeds** | **$26.6 million** |

31.　　Defendant Mary Tagliaferri ("Tagliaferri") has served as Nektar's Chief Medical Officer since December 2017.　Defendant Tagliaferri sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of her stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| February 16, 2017 | 1,965 | $13.14 | $25,820 |
| March 20, 2017 | 112,500 | $19.69 | $2,215,125 |
| May 16, 2017 | 2,651 | $19.55 | $51,827 |
| August 16, 2017 | 2,648 | $19.32 | $51,159 |
| February 16, 2018 | 2,545 | $82.94 | $211,082 |
| April 16, 2018 | 13,881 | $101.46 | $1,408,366 |
| May 16, 2018 | 3,576 | $83.39 | $298,202 |
| February 19, 2019 | 1,808 | $42.39 | $76,641 |
| May 16, 2019 | 1,928 | $31.37 | $60,481 |
| **Total Shares** | **1,308,248** | **Total Proceeds** | **$51.8 million** |

32.　　Defendant Jonathan Zalevsky ("Zalevsky") has served as Nektar's Chief Research & Development Officer since October 1, 2019, when he was promoted from within the Company.　Prior to his current position, defendant Zalevsky served as Chief Scientific Officer since December 2017.

33.　　Defendant Jillian B. Thomsen ("Thomsen") has served as Nektar's Chief Accounting Officer since April 2008 and Senior Vice President since 2006.

34.　　Defendant Jeff Ajer ("Ajer") has served as a director of the Board since September 2017.　Defendant Ajer was a member of the Company's Audit Committee during the Relevant

11

Period. According to the Company's filings with the SEC, defendant Ajer received $709,051 in compensation from the Company in 2018. Defendant Ajer sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| September 20, 2018 | 6,750 | $56.76 | $383,130 |

35. Defendant Robert B. Chess ("Chess") has served as a director of the Board since May 1992. Defendant Chess has also served as Chairman of the Board since 1999. Defendant Chess additionally served the Company in a variety of positions over the years. He served as acting President and CEO from March 2006 to January 2007, and as Executive Chairman from April 1999 to January 2007. Defendant Chess also served as Co-CEO from August 1998 to April 2000, as President from December 1991 to August 1998, and as CEO from May 1992 to August 1998. According to the Company's public filings with the SEC, defendant Chess received $741,551 in compensation from the Company in 2018. Defendant Chess sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| March 14, 2017 | 5,000 | $15.41 | $77,050 |
| April 17, 2017 | 5,000 | $18.72 | $93,600 |
| May 15, 2017 | 5,000 | $19.79 | $98,950 |
| September 21, 2017 | 6,400 | $21.73 | $139,008 |
| April 6, 2018 | 25,000 | $92.14 | $2,303,500 |
| May 3, 2018 | 25,000 | $82.80 | $2,070,000 |
| June 5, 2018 | 10,000 | $55.16 | $551,600 |
| September 19, 2018 | 4,500 | $56.81 | $255,645 |
| **Total Shares** | **85,900** | **Total Proceeds** | **$5.6 million** |

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

36.    Defendant R. Scott Greer ("Greer") has served as a director of the Board since February 2010.  Defendant Greer also served as Chair of the Company's Audit Committee during the Relevant Period.  According to the Company's public filings with the SEC, defendant Greer received $732,551 in compensation from the Company in 2018.  Defendant Greer sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| April 6, 2018 | 30,000 | $92.22 | $2,766,600 |
| June 4, 2018 | 1,400 | $61.99 | $86,786 |
| June 6, 2018 | 8,600 | $60.00 | $516,000 |
| September 4, 2018 | 10,000 | $67.39 | $673,900 |
| **Total Shares** | **50,000** | **Total Proceeds** | **$4 million** |

37.    Defendant Lutz Lingnau ("Lingnau") has served as a director of the Board since August 2007.  According to the Company's filings with the SEC, defendant Lingnau received $715,301 in compensation from the Company in 2018.  Defendant Lingnau sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| February 21, 2017 | 30,000 | $13.08 | $392,400 |
| April 7, 2017 | 7,000 | $20.05 | $140,350 |
| July 14, 2017 | 30,000 | $20.76 | $622,800 |
| September 22, 2017 | 5,000 | $21.97 | $109,850 |
| April 5, 2018 | 30,000 | $101.74 | $3,052,200 |
| September 20, 2018 | 9,000 | $56.98 | $512,820 |
| July 8, 2019 | 10,000 | $34.63 | $346,300 |
| **Total Shares** | **121,000** | **Total Proceeds** | **$5.1 million** |

38.    Defendant Roy A. Whitfield ("Whitfield") has served as a director of the Board since August 2000.  Defendant Whitfield was a member of the Company's Audit Committee during the

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

Relevant Period. According to the Company's public filings during the Relevant Period, defendant Whitfield received $708,301 in compensation from the Company in 2018.

39. Defendant Karin Eastham ("Eastham") has served as a director of the Board since September 2018. Defendant Eastham was a member of the Company's Audit Committee during the Relevant Period. According to the Company's public filings with the SEC, defendant Eastham received $1,143,749 in compensation from the Company in 2018.

40. Defendant Christopher A. Kuebler ("Kuebler") served as a Company director from December 2001 until his retirement in December 2018. According to the Company's public filings with the SEC, defendant Kuebler received $708,179 in compensation from the Company. Defendant Kuebler sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| April 5, 2018 | 15,000 | $21.88 | $328,200 |
| September 22, 2017 | 4,000 | $21.86 | $87,440 |
| January 2, 2018 | 30,000 | $58.66 | $1,759,800 |
| March 6, 2018 | 2,600 | $100.30 | $260,780 |
| March 7, 2018 | 37,400 | $97.41 | $3,643,134 |
| **Total Shares** | **89,000** | **Total Proceeds** | **$6 million** |

41. Defendant Dennis L. Winger ("Winger") served as a Company director from December 2009 until his resignation in September 2018. Defendant Winger sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| August 13, 2018 | 17,125 | $61.04 | $1,045,310 |
| August 14, 2018 | 17,125 | $60.15 | $1,030,068 |
| August 17, 2018 | 15,000 | $59.62 | $894,300 |
| August 21, 2018 | 15,000 | $60.30 | $904,500 |
| **Total Shares** | **64,250** | **Total Proceeds** | **$3.8 million** |

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

42.     Defendants Greer, Ajer, Eastham, Whitfield, and Winger are sometimes referred to herein as the "Audit Committee Defendants."

43.     Defendants Robin, Labrucherie, Kuebler, Greer, Chess, Ajer, Thomsen, Nicholson, Gergel, Doberstein, Lingnau, and Winger are sometimes referred to herein as the "Insider Selling Defendants."

44.     Defendants Robin, Ajer, Chess, Greer, Lingnau, Whitfield, and Eastham are sometimes referred to herein as the "Director Defendants."

45.     Defendants Robin, Labrucherie, Doberstein, Gergel, Nicholson, Tagliaferri, Thomsen, Zalevsky, Kuebler, Ajer, Chess, Greer, Lingnau, Whitfield, Eastham, and Winger are sometimes referred to herein collectively as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

46.     By reason of their positions as officers, directors, and/or fiduciaries of Nektar and because of their ability to control the business and corporate affairs of Nektar, the Individual Defendants owe the Company and its stockholders the fiduciary obligations of loyalty, good faith, candor, and due care and are required to use their utmost ability to control and manage Nektar in a fair, just, honest, and equitable manner. The Individual Defendants are required to act in furtherance of the best interests of Nektar and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Nektar and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

47.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Nektar, directly and/or indirectly, exercised control over the wrongful acts complained of herein.

48.     To discharge their duties, the officers and directors of Nektar were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls

of the Company. By virtue of such duties, the officers and directors of Nektar were required to, *inter alia*:

A.   Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, complying with all FAA rules and regulations, and disseminating truthful and accurate statements to the SEC and the investing public;

B.   Conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

C.   Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

D.   Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

E.   Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

49.   Each of the Individual Defendants, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith, and a reckless disregard for their duties to the Company and its stockholders. The Individual Defendants were, or should have been, aware that their conduct posed a risk of serious injury to the Company.

50.   As the Company's Corporate Governance Policy Statement states:

The Board's responsibilities include the following:

•   Understand and approve Nektar's long-term strategies;

16

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

- Identify and address the primary issues confronting Nektar with respect to such strategies;

- Identify and address the most important risks facing Nektar;

- Identify, review and evaluate candidates to serve as Chief Executive Officer;

- Review and evaluate the performance of the Chief Executive Officer;

- Review Chief Executive Officer succession plan on an annual basis;

- Oversee management to ensure that it acts in the best interest of the corporation and its stockholders;

- Approve acquisitions, divestitures and other major corporate actions;

- Approve Nektar's annual operating financial plan, including significant capital expenditures; and

- Ensure processes are in place for maintaining the integrity of Nektar's financial statements and complying with applicable laws and a publicly available Code of Conduct.

51. The Company also maintains a Code of Business Conduct and Ethics (the "Code"). The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of Nektar and its subsidiaries.

52. According to the Code, the employees and directors of Nektar are responsible for helping Nektar maintain its good reputation and the trust and confidence of its stockholders, its employees, the public, and those with whom Nektar does business.

53. Pursuant to the Code:

The integrity of our records and public disclosure depends on the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. All records and reports should be made in a timely manner, and, when applicable, should be properly authorized and maintained. Financial and other activities are to be recorded in compliance with all applicable laws and accounting practices.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the reports we file with the Securities and Exchange Commission ("SEC"). These reports must provide full, fair, accurate, timely and understandable disclosure and fairly

present our financial condition and results of operations. In connection with these obligations:

- no one may knowingly take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- everyone must cooperate fully with our Finance Department and Legal Department, as well as our independent public accountants and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no one should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

54.     Similarly, Nektar's Audit Committee Charter sets forth the primary duties of the Board's Audit Committee. According to the Audit Committee Charter, the purpose of the Audit Committee was as follows:

The primary responsibility of the Committee is to oversee the Company's financial reporting process (including direct oversight of the auditors) on behalf of the Board and report these activities to the Board. Management is responsible for preparing the Company's financial statements, and the independent auditors are responsible for auditing those financial statements.

*       *       *

The Committee shall:

1.      Evaluate the performance of the independent auditors, assess their qualifications, determine whether to retain or to terminate the existing auditors or to appoint and engage new independent auditors for the ensuing year. The Committee shall have the sole and exclusive authority with respect to such matters and the oversight of the independent auditors as a whole, and the independent auditors shall report directly to the Committee.

2.      Review and determine the engagement of the independent auditors, including the overall scope and plans for their respective audits, the adequacy of staffing and compensation. Negotiate and execute, on behalf of the Company, any engagement letters with the Company's independent auditors with respect to such engagement, which actions may be pursuant to preapproval policies and procedures, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

3. Establish guidelines and procedures with respect to the rotation of the lead (or coordinating) audit partners (having primary responsibility for the audit) and the audit partner responsible for reviewing the audit in accordance with applicable law and SEC and Nasdaq regulations (including regulations with respect to the independence of the independent auditors) and confirm that the independent auditors are in compliance with such policies.

4. Review and approve the retention of the independent auditors for any permissible non-audit services in accordance with applicable law and SEC and Nasdaq regulations and the fees or other compensation for such services (such approval may be delegated to one or more Committee members, provided that all approvals of permissible non-audit services pursuant to this delegated authority be presented to the full Committee at its next meeting).

5. At least annually, obtain and review a formal written statement prepared by the independent auditor delineating all relationships between the independent auditor and the Company, consistent with Rule 3526 of the Public Company Accounting Oversight Board, discuss with the independent auditors and review the auditors' independence from management and the Company, including the provision of non-audit services, past employment by the independent auditors of current or prospective Company personnel, the matters included in the written disclosures required by the Independence Standards Board and other relationships or services that could affect the objectivity of the independent auditors, and assess and otherwise take, or recommend that the Board take, appropriate action to oversee the independence of the independent auditors.

6. Review with the independent auditors any management or internal control letter issued or, to the extent practicable, proposed to be issued by the independent auditors and management's response, if any, to such letter, any communications between the audit team and the independent auditor's national office regarding auditing or accounting issues presented by the engagement, as well as additional material written communications between the independent auditors and management.

7. Review with management and the independent auditors the scope, adequacy and effectiveness of the Company's financial reporting controls, including analysis reports prepared by management and the independent auditors of significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any special audit steps taken in the event of material control deficiencies, and an analysis of the effect of alternative GAAP methods on the Company's financial statements.

8. Review and discuss with management, the Company's Risk Management Committee, the Company's internal auditor and the independent auditors, as appropriate, the Company's major financial risks, the Company's policies for assessment and management of such risks, and the steps to be taken to control such risks. Provide oversight to the Company's Risk Management Committee regarding such risks, which may include the areas of finance, information technology, internal audit, or law or other risks as the Committee or the Board deems appropriate.

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

9.    Establish (at such time as legally required) and maintain procedures for the receipt, retention and treatment of complaints received by the Company (whether initiated by employees of the Company or third parties) with respect to accounting, internal accounting controls or auditing matters, which shall include procedures for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

10.   Undertake the responsibility to investigate and resolve any disagreements between the Company's management and the independent auditors regarding the Company's financial reporting, accounting practices or accounting policies.  Review with the independent auditor any other problems or difficulties the independent auditor may have encountered during the course of the audit work, including any restrictions on the scope of audit activities or access to required information and any significant changes in the planned scope of the audit.

11.   Meet at least once during each fiscal quarter and as deemed necessary by the Committee.  In addition, meet not less than twice annually with senior management and the independent auditors in separate executive sessions.  In connection with separate executive sessions held with the independent auditors, discuss matters relevant to the quality and integrity of the Company's financial reporting, the results of the independent auditors' examinations, inquire as to the independent auditors' evaluation of the Company's financial and accounting policies and controls and discuss any other matter that the Committee, the independent auditors or management feel should be discussed in private.

12.   Discuss with management and the independent auditors the results of the independent auditors' review of the Company's quarterly financial statements, prior to public disclosure or prior to the filing of the Company's Quarterly Report on Form 10-Q with the SEC.  Such review shall include all matters required by applicable laws, rules and regulations to be discussed with the independent auditors prior to the filing of such report as well as such matters required to be communicated to the Committee by the independent auditors under Statement on Auditing Standards No. 114.

13.   Discuss with management and the independent auditors the financial statements to be included in the Company's Annual Report on Form 10-K (or the annual report to stockholders if distributed prior to the filing of Form 10-K). Discuss with management and the independent auditors the results of the annual audit, including the auditors' judgment about the quality, not just acceptability, of accounting principles, any changes in accounting procedures, the reasonableness of significant judgments and estimates (including material changes in estimates), the clarity of the disclosures in the financial statements and any audit adjustments noted or proposed by the auditors (whether "passed" or implemented in the financial statements).  Such review shall include all matters required by applicable laws, rules and regulations to be discussed with the independent auditors prior to the filing of such report as well as such matters required to be communicated to the Committee by the independent auditors under Statement on Auditing Standards No. 114. Recommend to the Board whether, based on the discussion with management and the independent auditors, the financial statements should be included in the Company's Annual Report on Form 10-K.

14.     Review and discuss with management and the independent auditors as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

15.     Review and discuss with management and the independent auditors any material financial arrangements of the Company which do not appear on the financial statements of the Company and any transactions or courses of dealing with parties related to the Company which transactions are significant in size (as required by applicable Nasdaq rules) or involve terms or other aspects that differ from those that would likely be negotiated with independent parties, and which arrangements or transactions are relevant to an understanding of the Company's financial statements.

16.     Review with management and the independent auditors significant issues that arise regarding accounting principles and financial statement presentation, including the adoption of new, or material changes to, existing critical accounting policies or to the application of those policies, the potential effect of alternative accounting policies available under GAAP, the potential impact of regulatory and accounting initiatives and other matters required by applicable laws, rules and regulations to be communicated by the independent auditors to the Committee or which represent significant reporting issues or judgments.

17.     Discuss with management and the independent auditors any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process or accounting policies.

18.     Review the Company's investment policy for its cash reserves, corporate insurance policies, information technology infrastructure and general fraud monitoring practices and procedures, including the maintenance and monitoring of a whistleblower hotline and the segregation of duties and access controls across various functions.

19.     Submit the minutes of all meetings of the Committee to, or discuss the matters discussed at each Committee meeting with, the Board.

20.     Investigate any matter brought to the Committee's attention within the scope of the Committee's duties.

21.     Prepare a report for inclusion in the Company's annual report or proxy statement that describes the Committee's composition and responsibilities and how those responsibilities were discharged.

55.     In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such

controls over reporting. The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false representations to the SEC, the investing public, and the Company's stockholders.

56. In addition, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Nektar to make false and misleading statements of material fact about the Company's financials and about Nektar's maintenance of adequate internal controls.

57. Each of the Individual Defendants further owed to Nektar and its stockholders the duty of loyalty requiring that each favor Nektar's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

## FACTUAL ALLEGATIONS

### Background

58. Nektar is a research-based biopharmaceutical company focused on discovering and developing innovative medicines in areas of high unmet medical need. Nektar's research and development pipeline of new investigational drugs includes potential therapies for cancer, autoimmune disease, and chronic pain. Nektar purportedly leverages its proprietary and proven chemistry platform to discover and design new drug candidates. According to Nektar, these drug candidates utilize its advanced polymer conjugate technology platforms, which are designed to enable the development of new molecular entities that target known mechanisms of action.

59. Nektar's lead immuno-oncology candidate is NKTR-214, also known as bempegaldesleukin or bempeg. NKTR-214 is a biologic substance developed to stimulate proliferation and growth of tumor-killing immune cells in the tumor-micro-environment.

60. The Company classifies NKTR-214 as an immunostimulatory cytokine drug. NKTR-214 is designed to preferentially activate IL-2 receptors to proliferate tumor-killing cells in the body without stimulating certain regulatory cells, thereby increasing IL-2's efficiency and NKTR-214's safety and efficacy as a cancer therapy. Nektar has conducted several clinical trials of NKTR-214 as a monotherapy (on its own) as well as in combination with other drugs, such as Bristol-Myers's Opdivo® (nivolumab), a human monoclonal antibody cancer medication.

61. Bristol-Myers already had Opdivo and Yervoy, cancer-fighting drugs, already on the market. Opdivo and Yervoy, however, only worked in approximately one in five patients with solid tumors. To increase success rate, Bristol-Myers began looking to combine their approved drugs with other drugs still in the development phase, including collaborating with Nektar on NKTR-214.

62. Test results from a collaboration of NKTR-214 and Opdivo between 2016 and 2017 indicated that the combination could be effective in more than half of patients. According to one *Forbes* reporter, early results combining Opdivo and NKTR-214 were presented in November 2017, and "showed the drug combination shrinking skin, kidney, and lung tumors in many patients, including some who saw their tumors disappear. But there was no control group of patients randomly assigned to receive Opdivo alone, [which] ma[de] it hard to be certain that the results were really due to adding NKTR-214."

63. In September 2016, the Company entered into a collaboration agreement with BMS to conduct Phase 1/2 trials evaluating the combination of NKTR-214 and BMS's Opdivo in thirty-eight patients (the PIVOT-02 study). Phase 2 of the PIVOT-02 study evaluated the clinical benefit, safety, and tolerability of the combined therapy in thirty-eight patients. The Company presented interim data from the study at the 2017 Society for Immunotherapy of Cancer ("SITC") meeting in November 2017. The Company presented impressive early-stage trial data for the study of NKTR-214, and those results were well received by the market. Market analysts published positive reports

on the news, with Investor Business Daily reporting on November 13, 2017, that "Nektar Therapeutics launched to a nearly 17-year high Monday on strong combination data for its immune-oncology drug combined with Bristol-Myers Squibb's Opdivo in skin, kidney and lung cancers."

64. On February 13, 2018, Nektar entered into a Strategic Collaboration Agreement with Bristol-Myers, to jointly develop NKTR-214. The key economic components of the collaboration transaction included Bristol-Myers making a non-refundable up-front payment of $1 billion to Nektar and an $850 million equity investment in the Company's common stock at a premium over the 20-day volume weighted average price for each share of common stock, Bristol-Myers being responsible for a majority of the costs of the collaboration development plan, the Company's annual funding obligation for collaboration development being limited to $125 million, Nektar retaining a 65% profit interest in NKTR-214, and recording global revenue for NKTR-214 commercial sales. Together, Nektar and BMS are jointly developing NKTR-214 under an expansive joint development plan that encompasses more than 20 indications across nine tumor types.

65. In addition to the $1.85 billion cash and stock deal, Nektar would receive a massive incentive program worth an additional $1.78 billion in milestone payments upon the completion of certain developmental, regulatory, and sales targets.

66. Media outlets reported that the agreement was the largest single-drug collaboration in history and extremely lucrative to Nektar. The *San Francisco Business Times* called the deal "record-smashing" and a "drug industry record." *Forbes* described the agreement as "a whopping sum, especially for a minority stake in [one] drug."

67. Although the PIVOT-02 trial seemed a success from the outset, certain of the Individual Defendants engaged in a scheme to manipulate the clinical trial results of Nektar's PIVOT-02 trial by presenting patient data that was not validated, selectively choosing patients to participate in the trial, delaying the disclosure of results that were less positive while disclosing positive results, and neglecting the risks posed by the unsustainable fictional image they created of NKTR-214's success.

68.     The Individual Defendants touted the collaboration agreement in a press release issued on February 14, 2018, stating that the agreement "[e]stablishes a broad joint clinical development plan combining NKTR-214 with [Bristol-Myers's] Opdivo and Opdivo plus Yervoy (ipilimumab) in registration-enabling trials in more than 20 indications across 9 tumors."

69.     The Individual Defendants continued to tout the collaboration agreement during a conference call held with investors and analysts held on February 14, 2018.  During the call, defendant Robin emphasized that Nektar was entitled to "substantial upfront" cash of $1.85 billion and may earn "future cash payments" totaling $1.78 billion.

70.     The Individual Defendants likewise touted the collaboration agreement in a Form 10-K filed with the SEC for fiscal 2018 stating, "We and [Bristol-Myers] are jointly developing NKTR-214 under an expansive joint development plan . . . that encompasses more than 20 indications across nine tumor types. . . . Many other registrational studies in additional tumor types and indications are planned to begin in 2019."  The Individual Defendants added in the same Form 10-K that "[u]nder the [collaboration agreement], we and [Bristol-Myers] will collaborate to develop and conduct clinical studies of NKTR-214  pursuant to a joint development plan, which includes a series of registration-enabling trials in nine tumor types and may be revised only upon mutual agreement of the parties."

71.     The Individual Defendants continued to tout the collaboration in its SEC filings the rest of 2018 and the first half of 2019.

72.     In January and February 2019, it was well-known within Nektar and Bristol-Myers that the NKTR-214 collaboration would need to be narrowed in scope.  Instead of pursuing 20 indications across 9 tumor types, Nektar and Bristol-Myers were only pursuing renal, prostate, and lung cancers.  The reduction of the NKTR-214 research was due to concerns with preliminary analyses, market commercialization, patient population needs, ability to get approval for the drug, and difficulties in recruiting doctors and sites.

73.     Through the PIVOT-02 clinical study, the Company evaluated the benefit, safety, and tolerability of combining NKTR-214 with Opdivo in collaboration with Bristol-Myers.  Around the

same time Nektar and Bristol-Myers were narrowing the scope of NKTR-214 research, Nektar was experiencing problems in its manufacturing processes with respect to certain batches of NKTR-214 used in clinical trials.

**The Individual Defendants' Materially False and Misleading Statements and Omissions**

74. Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants committed securities fraud by: (1) knowingly including outlier data that skewed the trial results; (2) claiming the data set consisted of ten patients, when it consisted of five; (3) falsely implying that NKTR-214 selectively proliferated cancer-killing cells in the same patients that experienced negligible increases of immunosuppressive cells, when those results occurred in different groups of patients; (4) stating that the dosing schedule was every 3 weeks, when a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (5) Nektar and Bristol-Myers had decided to reduce the number of indications for which FDA approval would be sought; (6) the Company did not comply with current good manufacturing practices; (7) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (8) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (9) as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (10) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

75. On January 10, 2017, defendant Robin, on behalf of Nektar, gave an oral presentation at the 35th annual JP Morgan Healthcare Conference. The presentation included data from the Phase 1 trial of NKTR-214 with results based on a sample size of 10 patients. The Company later included this same data in its presentation at 2017 ASCO GU in February.

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT



76.     At the conference, defendant Robin made several remarks during his presentation representing that this data came from a single 10-patient data pool that experienced a single, unified treatment plan, stating, in relevant part:

> We've designed a new IL-2 molecule with a biased action to the beta gamma receptors and not the alpha receptor. And ***consequently, there, you can produce significant quantities of CD8-positive cells without affecting the production or the proliferation of regulatory T-cells.*** The other thing we've done is made a prodrug because one of the problems you have with native IL-2 is when you administer a native IL-2, it releases immediately in plasma, and you get this massive unwanted immune response. It's very short-lived but it has very, very serious side effects in terms of cytokine storm, et cetera. ***And what we've done is designed a molecule where the biological linker's released in the tumor microenvironment, and you don't see—and therefore, you get the full effect of the cytokine in the tumor, not in circulation.*** So with that, you're also able to achieve antibody-like dosing.

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

So we're dosing—***we're dosing NKTR-214 once every 2 to—once every 3 weeks in an outpatient setting***. So here's some data from the Phase 1 trial. Demonstrating—and ***there are 10 patients where we have tumor biopsies.*** And you can clearly see that ***we had a significant increase in CD8-positive T-effector cells with no increase in T-reg cells... And this is clearly what we set out to do, cause the proliferation of regulatory T-effector cells and not cause the proliferation of regulatory T-cells.***

77.     On March 7, 2017, defendant Doberstein, on behalf of Nektar, showed a data slide at the 37th annual Cowen & Company Healthcare Conference.  The slide was identical to one of those displayed at the JP Morgan Conference in January 2017.  This same data was included in the Company's presentation at 2017 ASCO GU in February 2017.



78.     At the conference, defendant Doberstein made several remarks about the data, again purporting to show data from a single 10-patient data pool that experienced a unified treatment plan, stating, in relevant part:

Now, what we have found in patients from NKTR-214 is that first, as a monotherapy, it does pretty much exactly what we designed it to do. You can see a 30-fold increase

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

in CD8 cells inside the tumors of patients from tumor biopsies who received NKTR-214 with almost no increase in T-regs, and that's exactly the way that we designed the medicine to act.

79.    On May 22, 2017, defendant Zalevsky, on behalf of Nektar, displayed a data slide at the UBS Healthcare Conference.  The slide was identical to one of those displayed at the JP Morgan Conference and the Cowen & Company Conference in January 2017 and March 2017, respectively. This same data was included in the Company's presentation at 2017 ASCO GU in February.



80.    At the conference, defendant Zalevsky made several remarks about the data, representing that this data came from a single 10-patient data pool that experienced a unified treatment plan, stating that "CD8 T-cells increased by 30-fold in the tumor microenvironment. This is shown just after a single-dose administration of NKTR-214, and completely consistent with the design, the T-regs, which are not touched due to the bias of the molecule, are unchanged."

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

81.     On June 7, 2017, defendant Doberstein, representing the Company, displayed a NKTR-214 data slide at the Jeffries Conference.  The slide was identical to a slide that had been previously displayed at the JP Morgan Conference, the Cowen & Company Conference, and the UBS Healthcare Conference in January, March, and May 2017, respectively.  This same data was included in the Company's presentation at 2017 ASCO GU in February.   At the conference, defendant Doberstein made several remarks about the data, once more representing its source as a single 10-patient data pool that experienced a unified treatment plan, stating, in relevant part:

> It's very important that there be resident T-cells there in the tumor so that we can activate them and even when we think about using checkpoint inhibitors, if there are no T-cells there to release the brakes on, then that—then those therapies aren't going to work. So very important that we increase the T-cell populations. You can see here when we do Q3-week dosing, almost a thirtyfold increase in tumor cells within the biopsy—T-cells within the tumor biopsy of the effector cell type. So very important observations from the biomarker standpoint.

82.     On November 11, 2017, Nektar issued a press release entitled "First Data for NKTR-214 in Combination with OPDIVO® (nivolumab) for Patients with Stage IV Melanoma, Renal Cell Carcinoma and Non-Small Cell Lung Cancers, Including Patients with PD-L1 Negative Status, Revealed at SITC 2017."  The press release announced the results of a study done by the Company with BMS evaluating the combination of NKTR-214 with BMS's drug, Opdivo.  The press release indicated that "[t]he initial results presented at the 2017 Society for Immunotherapy of Cancer (SITC) Annual Meeting reported both safety and efficacy data for patients enrolled in the dose-escalation phase of the trial."   The press release also detailed the specific findings of the study, including statements about the treatment's purported success from defendant Tagliaferri. The release stated, in relevant part:

> "These initial findings underscore the potential benefit of the combination of Opdivo and NKTR-214 across several tumor types," said Fouad Namouni, M.D., Head of Oncology Development, Bristol-Myers Squibb. "We believe that a combination regimen which utilizes two different, complementary, and nonoverlapping mechanisms designed to harness the body's own immune system to fight cancer has the potential to benefit patients and should be the subject of additional research."
>
> *Opdivo* is a PD-1 immune checkpoint inhibitor designed to overcome immune suppression. NKTR-214 is an investigational immuno-stimulatory therapy designed to expand and activate specific cancer-fighting T cells and natural killer (NK) cells

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

directly in the tumor micro-environment and increase expression of cellsurface PD-1 on these immune cells.

"In the dose-escalation stage of the PIVOT trial, we've observed important response rates across all three tumor types-melanoma, renal cell carcinoma and non-small lung cancer - in both PD-L1 positive and PD-L1 negative patients," said Mary Tagliaferri, M.D., Senior Vice President of Clinical Development at Nektar Therapeutics. "All patients with responses in the trial continue on treatment. Of note, we observed responses in 3 of 4 Stage IV non-small cell lung cancer patients whose tumors did not express PD-L1 and who had progressed on prior chemotherapy, including one patient who experienced a complete response. In the combination treatment, there were no Grade 3 or higher immune-mediated adverse events at the recommended Phase 2 dose or below. Nektar and Bristol are now actively enrolling patients in the Phase 2 expansion part of the PIVOT study in 5 different tumor types."

A total of 38 patients were enrolled in the dose-escalation phase of the ongoing PIVOT study in a number of dose cohorts. Responses were measured per RECIST 1.1 for efficacy-evaluable (> 1 on treatment scan) patients as of November 2, 2017.

Highlights from the oral presentation include:

• Advanced Treatment-Naïve 1L Melanoma Patients (Stage IV):
    o Responses were observed in 7/11 (63%) efficacy-evaluable patients (2 CR and 5 PR). Median time to response was 1.7 months. DCR, also known as disease control rate (CR + PR + 3 SD), was 91%. All 7 patients with responses continue on treatment in the trial.

• Advanced Treatment-Naïve 1L Renal Cell Carcinoma Patients (Stage IV):
    o For patients with one or more baseline scans, responses were observed in 6/13 patients (46%) (1 CR+ and 5 PR). DCR (CR + PR + 5 SD) was 85%. Median time to response in these patients was 1.9 months. For patients with two or more scans available, responses were observed in 6/10 patients (60%) (1 CR, 5 PR, 2 SD). All 11 patients with disease control (CR, PR or SD) continue on treatment in the trial.

• Advanced 2L Renal Cell Carcinoma Patients (Stage IV, I-O Naïve)
    o For patients with one or more baseline scans, responses were observed in 1/7 patients (14%) (1 PR). DCR (CR + PR + 6 SD) was 100%. Median time to response was 3.5 months. All 7 patients with disease control (PR or SD) continue on treatment in the trial.

• Advanced 2L PD-L1 Negative Non-Small Cell Lung Cancer Patients (Stage IV, I-O Naïve)
    o Responses were observed in 3/4 patients (75%) (1 CR± and 2 PR). DCR (CR + PR) was 75%. Median time to response was 1.7 months. All 3 patients with responses continue on treatment in the trial.

• Robust expansion of ICOS+ CD4 and CD8+ T cells in the blood and increased ICOS gene expression in the tumor were both observed with the combination of NKTR-214 and nivolumab.

• The most common grade 1-2 adverse events were fatigue (74%), flu-like symptoms (68%), rash (60%) and pruritus (42%). There were no treatment discontinuations due to adverse events (AEs) or study deaths.

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

• There were no grade 3 or higher immune-mediated AEs (such as colitis, dermatitis, hepatitis, pneumonitis or endocrinopathies) at the recommended Phase 2 dose or below.

• A recommended Phase 2 dose of NKTR-214 0.006 mg/kg q3w + nivolumab 360 mg q3w was established and is being evaluated in expansion cohorts in over 10 patient populations with melanoma, renal cell carcinoma, non-small cell lung cancer, bladder, and triple-negative breast cancers (n=~330).

83. The press release briefly discussed the agreement between Nektar and BMS related to the commercialization of NKTR-214 in combination with Opdivo and touched on NKTR-214's function and clinical results.

84. The day of the press release, the Company also held an Investor Meeting at the annual meeting for the SITC to discuss the PIVOT-02 trial results and to expound on the efficacy of NKTR-214 when combined with Opdivo. Defendant Zalevsky made statements to this effect during the meeting, stating that "we know that in the presence of 214 there's such a high amount of activated immune cells. Different clones of immune cells recognizing multiple antigens, increasing the tumor killing army."

85. On November 15, 2017, defendant Zalevsky, on behalf of the Company, displayed a NKTR-214 data slide at the Jeffries London Healthcare Conference. The slide was identical to the slide that had been previously displayed at the JP Morgan Conference, the Cowen & Company Conference, the UBS Healthcare Conference, and the Jeffries Conference in January, March, May, and June of 2017, respectively. This same data was included at the Company's presentation at 2017 ASCO GU in February 2017.

86. At the conference, defendant Zalevsky gave an oral presentation with the slideshow about the benefits of NKTR-214. In describing the data on the slide, he stated, in relevant part:

We know that with NKTR-214, it can fill the gap of actually replenishing the patient's own immune system. In fact as a T-cell growth factor, it acts like an engine to grow armies and armies of antigen-specific, tumor reactive T-cells. These T-cells can infiltrate into the body, they can enter the tumor microenvironment and they can go to work, attacking the tumor with cells…

We profiled NKTR-214 in a monotherapy clinical trial and we reported these results over the last year and a half. Now the key with this monotherapy study was that we wanted to prove the mechanism of action in the patient's tumor itself. And so we collected a number of biopsies, both pretreatment and on-treatment, and we use those

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

biopsies to characterize the functions of NKTR-214, shown here in this slide is the effect that NKTR-214 has on inducing T-cell infiltrates into the tumor. And you can see there's a 30-fold increase in the amount of CD8 T-cells that entered into the tumor and because of the biased signaling, you can see there's no change in Tregs. So this is very much skewed and dominated tumor killing cytotoxic T-cell response.

87.     On November 28, 2017, defendant Zalevsky, on behalf of the Company, displayed a NKTR-214 data slide at the Piper Jaffray Healthcare Conference.  The slide was identical to the slide that had been previously displayed at the JP Morgan Conference, the Cowen & Company Conference, the UBS Healthcare Conference, the Jeffries Conference, and the Jeffries London Conference in January, March, May, June, and November of 2017, respectively.  This same data was included at the Company's presentation at 2017 ASCO GU in February 2017.

88.     On January 9, 2018, defendant Robin, displayed a NKTR-214 data slide at the 36th Annual JP Morgan Healthcare Conference.  This same data was included in the Company's presentation at 2017 ASCO GU in February.



89.     At the conference, defendant Robin made several remarks about the data, again representing that the patient pool received a single, unified treatment plan, stating, in relevant part:

So what we've done is, using our technology we have a biased receptor binding in such a way that we cause the proliferation of effector T-cells and we don't cause an increase in regulatory T-cells. And because of that, you can give very low doses of NKTR-214 dosed on an antibody-like schedule once every 3 weeks on an outpatient basis. You see nominal side effects, and you get a profound stimulation of the immune system . . . Here you could see on the chart on the left, a great—significant increase in effector T-cells with no increase in regulatory T-cell. Also, very important, in the left chart, you see that NKTR-214 also increases PD-1 expression. We take patients who are PD-L1 negative and turn them PD-L1 positive, another very, very important aspect of treating patients in the immunotherapy world.

90.     On March 1, 2018, Nektar issued a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2017. The press release quoted defendant Robin touting NKTR-214's clinical success and the transformative year Nektar had experienced:

This past year was truly transformational for Nektar as we achieved a number of successes with Nektar medicines across our three key therapeutic areas of immunooncology, immunology and pain," said Howard W. Robin, President and Chief Executive Officer of Nektar. "In the area of pain, we completed a successful Phase 3 program for NKTR-181 in over 2,100 patients and healthy volunteers that will comprise our NDA submission in the second quarter of this year. In immunology, we entered into a major partnership with Eli Lilly for NKTR-358, a potential first-in-class T regulatory resolution therapeutic, which will be developed to treat a broad range of auto-immune disorders. Finally, in immuno-oncology, the clinical success we achieved with NKTR-214 led to a groundbreaking collaboration with Bristol-Myers Squibb that now enables us to broadly and rapidly advance NKTR- 214 into over 20 registrational trials in up to 15,000 patients.

91.     On the same day, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2017 on a Form 10-K (the "2017 10-K"), which was signed by defendants Robin, Labrucherie, Thomsen, Chess, Ajer, Greer, Kuebler, Lingnau, Whitfield, and Winger. The 2017 10-K outlined Nektar's activities relating to the combination of NKTR-214 and Opdivo. The 2017 10-K detailed the Company's agreement with BMS to commercially develop combination therapy drugs with NKTR-214 and BMS compounds:

On September 21, 2016, we entered into a Clinical Trial Collaboration Agreement (BMS Agreement) with Bristol-Myers Squibb Company (BMS), pursuant to which we and BMS are collaborating to conduct Phase 1/2 clinical trials evaluating NKTR-214 and BMS' human monoclonal antibody that binds PD-1, known as Opdivo® (nivolumab), as a potential combination treatment regimen in at least five tumor types and eight indications, and such other clinical trials evaluating the combined therapy as may be mutually agreed upon by the parties (each, a Combined Therapy Trial). Under the BMS Agreement, BMS is responsible for 50% of all out-of-pocket costs reasonably incurred by us in connection with third party contract research organizations, laboratories, clinical sites and institutional review boards. Each party is otherwise responsible for its own internal costs, including internal personnel costs, incurred in connection with each Combination Therapy Trial. Interim data from the

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

dose-escalation phase of the trial was presented at the 2017 Society for Immunotherapy of Cancer (SITC) meeting in November 2017. We identified the Phase 2 dose for NKTR-214 and we are currently enrolling subjects in the expansion phase of the study.

On February 13, 2018, we entered into a Strategic Collaboration Agreement (the BMS Collaboration Agreement) with BMS, pursuant to which we and BMS will jointly develop NKTR-214, including, without limitation, in combination with BMS's Opdivo® (nivolumab) and Opdivo® plus Yervoy® (ipilimumab), and other compounds of BMS, us or any third party. The parties have agreed to jointly commercialize NKTR-214 on a worldwide basis. BMS will pay us a nonrefundable upfront cash payment of $1.0 billion and purchase $850.0 million of shares of our common stock at a purchase price of $102.60 per share pursuant to a Share Purchase Agreement (Purchase Agreement).

92. Attached to the 2017 10-K were SOX certifications signed by defendants Robin and Labrucherie attesting to the accuracy of the 2017 10-K.

93. On March 14, 2018, defendant Zalevsky, on behalf of Nektar, showed a data slide at the 38th annual Cowen & Company Healthcare Conference. This same data was included in the Company's presentation at 2017 ASCO GU in February.



94. At the conference, defendant Zalevsky made several remarks about the data, representing that this data came from a patient pool that experienced a single, unified treatment plan, stating, in relevant part:

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

And we're evaluating immunological changes in those biopsy tissues. And shown on the left is the proportion of the cytotoxic T-cells or regulatory T-cells that you see is a full change from week 3 to baseline. And you can see that there's a 30- fold induction of CD8 T-cells, but there's essentially no change in Tregs. This is exactly the design goal and this drives a very high CD8-to-Treg ratio.

95.    On May 10, 2018, the Company issued a press release announcing its financial results for the first fiscal quarter ended March 31, 2018. Defendant Robin promoted the progress of the Company, its NKTR-214 studies, and collaboration with BMS, stating, in relevant part:

Nektar begins 2018 in a very strong position with a major collaboration with Bristol-Myers Squibb for NKTR-214 and key advancements in our immunooncology and immunology pipeline . . . . The PIVOT study of NKTR-214 in combination with nivolumab continues to enroll patients and we are exceptionally pleased that the preliminary data from PIVOT was accepted for an oral presentation at this year's ASCO Meeting.

96.    On June 2, 2018, the rose-colored image that the Individual Defendants had painted of the Company's successful clinical trials, including the PIVOT-02 study, began to reveal its true colors. Nektar presented data from the Phase 1 dose-escalation and early data from the Phase 2 dose expansion phase of the Company's ongoing PIVOT study during an oral presentation at the ASCO annual meeting. The presentation disclosed objective response rates for 87 of the 283 patients that had been enrolled in the study as of May 7, 2018. Following the presentation, Nektar held an "Analyst and Investor Event" where a number of the same slides used during the ASCO presentation were shown. The data presented revealed that the overall response rate for NKTR-214 in treating melanoma had dropped significantly from the 85% response rate reported by the Company in November 2017 to a mere 50%.

97.    The same day, the Company issued a press release highlighting points from the oral presentation, stating in relevant part:

Stage IV Metastatic Treatment-Naïve 1L Melanoma Patients (Enrolled Per Fleming 2-Stage Design at RP2D):

Pre-specified efficacy criteria were met for Objective Response Rate (ORR) in Stage 1 (N1=13) with 11/13 (85%) of patients achieving either a partial response (PR) or complete response (CR). Median time on study for 28 patients in Stage 2 (N1+N2) is 4.6 months. Responses were observed in 14/28 (50%) patients (3 CR, 10 PR, 1 uPR). Amongst the 25 patients with known PD-L1 status, ORR in PDL1 negative patients was 5/12 (42%) and in PD-L1 positive patients was 8/13 (62%). One patient with unknown PD-L1 baseline status experienced a CR.

Stage IV Metastatic Treatment-Naïve 1L Renal Cell Carcinoma Patients (Enrolled Per Fleming 2-Stage Design at RP2D): Pre-specified efficacy criteria were met for ORR in Stage 1 (N1=11) with 7/11 (64%) of patients achieving a partial response (PR). Median time on study for 26 patients in Stage 2 (N1 + N2) is 5.6 months. Responses were observed in 12/26 (46%) patients (11 PR, 1 uPR). Amongst the 24 patients with known PD-L1 status, the ORR in PD-L1 negative patients was 9/17 (53%) and in PD-L1 positive patients was 2/7 (29%). One of two patients (50%) with unknown PD-L1 baseline status experienced a PR.

Stage IV Metastatic Treatment-Naïve 1L Urothelial Carcinoma (Enrolled Per Fleming 2-Stage Design at RP2D):

Pre-specified efficacy criteria were met for ORR in Stage 1 (N1=10) with 6/10 (60%) of patients achieving either a partial or complete response (2 uCR, 3 PR, 1 uPR). Median time on study for 10 patients in Stage 1 is 3.9 months. The ORR in PD-L1 negative patients was 3/5 (60%) and in PD-L1 positive patients was 3/5 (60%).

98.     These disappointing results came as a shock to investors, who had been primed by the Individual Defendants to expect further positive results. On this news, the price per share of Nektar stock plummeted approximately 41.82% from the previous day's closing price of $90.35 on June 1, 2018, to close at $52.57 on June 4, 2018. Nevertheless, the Individual Defendants continued to make misleading statements.

99.     In June 2018, Nektar released a video purporting to demonstrate (with digitally created graphics) the efficacy of NKTR-214, including the successful creation of CD8 T-cells without triggering growth of Tregs, or regulatory T-cells, within a tumor. In addition to the computer graphics representation, the video was voice-narrated, describing the events depicted in the visual representation. The narration contained information based partially on data from the Company's poster at the February 2017 ASCO Conference, stating, in relevant part:

Cancer immunotherapies are designed to enable a patient's own immune system to attack tumor cells, but existing therapies do not work for most patients, in part due to an insufficient number of cancer-fighting cells, and too many suppressive cells, which can blunt tumor-killing. What is needed is an immunotherapy that expands, mobilizes and accumulates these powerful cancer-fighting cells, namely CD8-positive effector T-cells and NK cells, within tumors—without expanding unwanted suppressive regulatory T-cells. NKTR-214 selectively grows cancer fighting cells, with the goal of making cancer immunotherapy more effective. Administration of this biologic pro-drug is by infusion once every three weeks. In the body, active conjugates emerge slowly over time, which avoids the overstimulation of the immune system. Activated NKTR-214 targets CD122 receptors found on the surfaces of cancer-fighting cells, which in turn drives their proliferation and accumulation inside the tumor. In clinical studies, treatment with NKTR-214 resulted in increases in cancer-fighting cells of up to 30-fold.

100.    On June 6, 2018, defendant Zalevsky, representing the Company displayed a NKTR-214 data slide at the Jeffries Conference.  The slide was identical to one that had been previously displayed at the 2018 Cowen & Company Conference in June.  This same data was included in the Company's presentation at 2017 ASCO GU in February.  At the conference, defendant Zalevsky made several remarks about the data, representing that this data came from a patient pool that experienced a single, unified treatment plan, stating, in relevant part:

> Now this slide shows clinical data from the monotherapy program for NKTR-214. What you can see in the bar chart on the right-hand side, you can see that for patients for whom we have collected several biopsies, you can see an elevation up to 30-fold in the proportion off tumor-infiltrating cytotoxic T-cells, shown in orange, with essentially no change in regulatory T-cells or Tregs. This is exactly the design goals of NKTR-214, demonstrated in principle in human patients.

101.    On August 8, 2018, the Company issued a press release announcing its financial results for the second fiscal quarter ended June 30, 2018, in which defendant Robin boasted of Nektar's "significant progress," specifically stating, "[o]ver the past few months, we have reported significant progress across all areas of our pipeline, with notable milestones for our immunooncology, immunology and pain programs . . . ."

102.    On October 1, 2018, Plainview published the Report, revealing that NKTR-214 did not live up to Nektar's claims and expectations with respect to the drug's safety and efficacy. According to the Report, the Company promoted NKTR-214 as "a promising treatment for cancer, particularly in combination with checkpoint inhibitors."  Specifically, "Nektar hypothesized that IL-2 could be improved by adding polyethylene glycol molecules to it (pegylating it) to extend the half-life and block interaction with IL2Rαβγ [a particular receptor.]"  In truth, the Report noted, "the anticipated benefits did not materialize and pegylation has proved to be a drag on efficacy."

103.    The Report stated that Nektar's plan to create a "new universal cancer treatment" by taking an unsuccessful monotherapy and expecting success when used as part of a combination therapy "has never worked in practice."  Furthermore, the Report stated that Nektar's decision to withhold 69% of response rates resulted in "an unprecedented level of data opacity" and stated

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

further that the "[f]irst rule of biotechnology investing: if a company withholds data from investors, that data is always bad."

104.    Further delving into the comparative analysis between IL-2 on its own versus NKTR-214, the Report found "[i]n clinical trials and retrospective analysis" that, while IL-2 had a historic objective response rate (ORR) of 15%-29% from data between 1995 and 2005, "NKTR-214, on the other hand, posted a stunning 0% ORR."

105.    In addition, the Report explained that pegylating IL-2 was not a novel concept, stating, "NKTR-214 is not the first attempt at pegylating IL-2"; indeed, the first paper on the topic was published in 1987. Due to "NKTR-214's 0% ORR," the Report noted that it was "very hard to believe that NKTR-214 [would] work as part of a combination therapy," and stated, in relevant part:

> For combination therapies in oncology, 2+2=3, not 2+2=5—the total effect is nearly always less than the sum of the parts. We are unaware of any oncology drug that reported a 0% ORR as a monotherapy and then went on to achieve success as part of a combination therapy, but there are many therapies with meaningful monotherapy ORR rates that have failed to add value as part of a combination therapy.

106.    Although NKTR-214's intended mechanism was to trigger proliferation of certain lymphocytes for clinical success, according to the Report the Company's recent PIVOT trial data revealed that the triggered response of lymphocytes came nowhere close to the required percent increase for actual effective treatment. Specifically, studies on IL-2 on its own established that "an IL-2 treatment requires a 200-300% increase in lymphocytes in order to elicit a response" and in "its most recent PIVOT trial data, NKTR-214 has induced a 33-50% increase in lymphocytes—missing the bar for efficacy by a wide margin and explaining why the monotherapy data was so poor."

107.    Turning to NKTR-214's extended half-life, the Report stated that it had no significant impact on the therapy's efficacy, specifically stating, "NKTR-214 is too weak to work, with a pharmacokinetic profile yielding only 7-20% of the active AUC of a standard cycle of IL-2 due to 1) lower maximum tolerated dose and 2) pegylation interfering with NKTR-214 drug activity." In fact, the extended half-life actually raised further safety issues due to the irreversibility of the front-loaded dosing.

108. The Report pointed out that the Company's claims regarding CD8+ data were "brazenly misleading," and Nektar's frequently cited "30-fold average change in tumor-infiltrating lymphocyte (TIL) CD8+" was "distorted by a single outlier patient who purportedly recorded an extreme change in TIL CD8+ but saw no clinical benefit." The source of this claim, as revealed by the Report was a chart contained in a poster displayed at a February 2017 ASCO symposium. Specifically, a line chart included in the poster revealed the outlier patient data and further depicted that no patient had actually experienced a 30-fold increase, but one patient—the outlier patient—saw a 300x increase, thereby skewing the reported average.

109. In conclusion, the Report stated that the Company's aim to improve IL-2 resulted in a product "that is completely useless for treating cancer," and further determined that Nektar's approach with NKTR-214 was problematic from the start:

> Elongating half-life with pegylation makes sense for many indications where the goal is to reach and maintain steady state. These include many neurological or chronic conditions that cannot be cured directly, such as pain or ADHD. However, it makes no sense for treating cancer. The goal is not to reach steady-state exposure to IL-2, it is to kill the malignant tumor cells.

> In exchange for the long half-life of NKTR-214, Nektar was forced to sacrifice both total and peak therapeutic effect. NKTR-214's PEG polymers also forced Nektar to use a significantly lower dose compared to IL-2. The end result is a drug with AUC that is much lower than IL-2, therapeutic effect (target receptor binding) that is even lower than the AUC would imply, and a maximum concentration that does not appear to meet the minimum threshold for efficacy.

> With a 0% ORR as a monotherapy, NKTR-214 has already failed where IL-2 succeeded, and by combining NKTR-214 with checkpoint inhibitors, Nektar is now trying to succeed where IL-2 failed. Neither the science nor the data support NKTR-214, and we are betting against it.

110. When news of the Report reached the public, the Company's price per share dropped $5.63 over the next two trading sessions from a closing price of $60.96 on September 28, 2018 to a closing price of $55.33 on October 2, 2018, a decline of over 9%.

111. Despite these truths being partially revealed, the Individual Defendants continued to make materially misleading statements and omissions regarding NKTR-214. On February 15, 2019, the Individual Defendants caused the Company to publish a press release discussing clinical data from the PIVOT-02 Study, which stated:

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

The preliminary results from patients enrolled in the 1L urothelial cancer cohort in the ongoing PIVOT-02 Phase 1/2 study were shared in a poster presentation today titled, *"NKTR-214 + nivolumab in first-line advanced/metastatic urothelial carcinoma (mUC): Updated results from PIVOT-02"* by Arlene O. Siefker-Radtke, M.D., Professor, Department of Genitourinary Medical Oncology, Division of Cancer Medicine at The University of Texas MD Anderson Cancer Center and Clinical Co-Leader of the Bladder Cancer SPORE Executive Committee.

"Preliminary data from the ongoing PIVOT-02 trial in metastatic urothelial cancer patients demonstrated important response rates, including complete responses, in patients who were cisplatin-ineligible or refused standard of care," said Mary Tagliaferri, M.D., Chief Medical Officer of Nektar Therapeutics. "These responses were observed regardless of baseline PD-L1 expression and no relapses occurred. In this cohort of Stage IV bladder cancer patients with a median age of 70, the combination therapy was generally well tolerated with no Grade 4 or 5 adverse events reported. Of note, our translational research demonstrated that in patients with the highest unmet medical need – those whose tumors did not express PD-L1 at their baseline scan – treatment with the combination resulted in 70 percent of patients converting to PD-L1 positive expressors. These data support our development strategy in this tumor setting, including the Phase 2 PIVOT-10 study underway in cisplatin-ineligible urothelial cancer patients with low PD-L1 tumor expression."

**Highlights from the ASCO-GU presentation in 1L metastatic urothelial carcinoma patients include:**

*Clinical Efficacy*

*Response measured per RECIST 1.1 for per protocol efficacy-evaluable patients treated at the recommended Phase 2 dose (RP2D) and with ≥1 post-treatment scan as of December 3, 2018:*

- Best overall response rate (ORR) was 48% (13/27) in efficacy-evaluable patients, with a 19% (5/27) complete response (CR) rate.

- ORR by immune-related RECIST (irRECIST) was 52% (14/27); ORR in patients with visceral non-nodal metastases was 53% (8/15).

- ORR in patients that refused standard of care was 55% (6/11); in cisplatin-ineligible patients ORR was 44% (7/16).

- Disease control rate (DCR) was 70% (defined as CR + partial response (PR) + stable disease (SD)).

- Median percent reduction in target lesions from baseline in all 27 efficacy-evaluable patients was 32%.

- Median percent reduction in target lesions from baseline in all 13 responders was 78%.

- Median time to response was 2.0 months.

- In patients with RECIST response, no patients discontinued due to relapse.

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

- Amongst the 23 patients with known pre-treatment programmed death-ligand 1 (PD-L1) status, ORR in PD-L1 negative patients was 45% (5/11) and in PD-L1 positive patients was 50% (6/12).

112. On February 28, 2019, the Individual Defendants caused the Company to issue a press release announcing the Company's financial and operational results for the fourth quarter of fiscal 2018. In the press release, the Individual Defendants noted that "[i]n February 2018, Nektar and Bristol-Myers [] entered into a global development and commercialization agreement to evaluate the full potential of bempegaldesleukin with nivolumab in more than 20 indications in 9 tumor types." The Individual Defendants also stated that they "continue to design and execute on [their] board registrational program for NKTR-214 (bempegaldesleukin) with our partner Bristol Myers[]."

113. On the same day, the Individual Defendants held a conference call with investors and analysts, during which defendant Robin stated:

> As you know, the joint development plan with Bristol includes about 20 registrational trials across multiple tumor types. And so far, the first 10 of these trials in the joint development plan, including our accelerated approval strategy in bladder cancer, have been initiated or in the process of starting . . . . [t]he [Bristol Myers] and Nektar teams have been working very closely together on the program, and we've made tremendous progress over a short period of time in building out a comprehensive registrational strategy across the tumor types in this collaboration.

114. During the call, defendant Labrucherie added that "[a] significant amount of our R&D budget represents our portion of the investment in the broad registrational development plan for NKTR-214 that we are executing with our partner [Bristol Myers]. We have multiple registrational studies underway with many more registrational studies planned."

115. On March 1, 2019, the Individual Defendants caused the Company to file a Form 10-K (the "2018 10-K") with the SEC announcing the Company's financial and operational results for the fourth quarter of 2018 and 2018 annually. Under the "Risk Factors" section of the 2018 10-K, the Individual Defendants stated:

> ***We are highly dependent on the success of NKTR-214, our lead I-O candidate. We are executing a broad development program for NKTR-214 and clinical and regulatory outcomes for NKTR-214, if not successful, will significantly harm our business.***
>
> Our future success is highly dependent on our ability to successfully develop, obtain regulatory approval for, and commercialize NKTR-214. In general, most early

stage investigatory drugs, including oncology drug candidates such as NKTR-214, do not become approved drugs. Accordingly, there is a very meaningful risk that NKTR-214 will not succeed in one or more clinical trials sufficient to support one or more regulatory approvals. To date, reported clinical outcomes from NKTR-214 have had a significant impact on our market valuation, financial position, and business prospects and we expect this to continue in future periods. If one or more clinical studies of NKTR-214 are delayed or not successful, it would materially harm our market valuation, prospects, financial condition and results of operations. For example, under the BMS Collaboration Agreement, we are entitled to up to $1.43 billion in development milestones that are based upon clinical and regulatory successes from the NKTR-214 development program. One or more failures in NKTR-214 studies could jeopardize such milestone payments, and any product sales or royalty revenue or commercial milestones that we would otherwise be entitled to receive could be reduced, delayed or eliminated.

*     *     *

***Our manufacturing operations and those of our contract manufacturers are subject to laws and other governmental regulatory requirements, which, if not met, would have a material adverse effect on our business, results of operations and financial condition.***

We and our contract manufacturers are required in certain cases to maintain compliance with current good manufacturing practices (cGMP), including cGMP guidelines applicable to active pharmaceutical ingredients and drug products, and with laws and regulations governing manufacture and distribution of controlled substances, and are subject to inspections by the FDA, the Drug Enforcement Administration or comparable agencies in other jurisdictions administering such requirements. We anticipate periodic regulatory inspections of our drug manufacturing facilities and the manufacturing facilities of our contract manufacturers for compliance with applicable regulatory requirements. Any failure to follow and document our or our contract manufacturers' adherence to such cGMP and other laws and governmental regulations or satisfy other manufacturing and product release regulatory requirements may disrupt our ability to meet our manufacturing obligations to our customers, lead to significant delays in the availability of products for commercial use or clinical study, result in the termination or hold on a clinical study or delay or prevent filing or approval of marketing applications for our products. Failure to comply with applicable laws and regulations may also result in sanctions being imposed on us, including fines, injunctions, civil penalties, failure of regulatory authorities to grant marketing approval of our products, delays, suspension or withdrawal of approvals, license revocation, seizures, administrative detention, or recalls of products, operating restrictions and criminal prosecutions, any of which could harm our business. Regulatory inspections could result in costly manufacturing changes or facility or capital equipment upgrades to satisfy the FDA that our manufacturing and quality control procedures are in substantial compliance with cGMP. Manufacturing delays, for us or our contract manufacturers, pending resolution of regulatory deficiencies or suspensions could have a material adverse effect on our business, results of operations and financial condition.

116. On May 8, 2019, the Individual Defendants issued a press release announcing the

Company's financial and operational results for the first quarter of fiscal 2019. In the press release,

the Individual Defendants stated that "Nektar continues to advance [its] immune-oncology and immunology pipeline with clinical trials initiating for multiple drug candidates across multiple indications. . . . We are working with our partner, Bristol-Myers [], to execute on our broad joint development program for NKTR-214 in combination with nivolumab, with registrational trials in melanoma, RCC, urothelial and non-small cell lung cancer underway and additional trials planned to begin in the coming months."

117.    On the same day, the Individual Defendants held a conference call with investors and analysts discussing Nektar's first quarter fiscal 2019 results, during which defendant Robin stated, "The joint development plan with Bristol includes many registrational trials across multiple tumor types. [Bristol Myers] and Nektar are currently working on the designs for the next wave of trials in lung, breast, gastric, and colorectal cancers as well as sarcoma. Our 2 teams have been working very closely together on trial designs in a changing competitive landscape."

118.    On June 1, 2019, the Individual Defendants caused the Company to publish a press release discussing clinical data from the PIVOT-02 Phase 2 study, which stated:

New baseline biomarker analyses and updated clinical study efficacy and safety results were shared in a presentation titled, "*Baseline tumor-immune signatures associated with response to bempegaldesleukin (NKTR-214) and nivolumab*" (Abstract #2623/Poster Board #267) by Michael Hurwitz, Ph.D., M.D. who serves as Assistant Professor of Medicine, Medical Oncology at Yale Cancer Center during the "Developmental Immunotherapy and Tumor Immunobiology" poster session on Saturday, June 1, 2019.

"The Stage IV melanoma patients enrolled in the ongoing PIVOT-02 study continue to experience both deepening and durability of response over time," said Jonathan Zalevsky, Ph.D., Chief Scientific Officer at Nektar Therapeutics. "This translated into a 34% rate of complete response at a 12-month follow-up for the 38 efficacy-evaluable patients in this cohort. Further, 42% of patients achieved a 100% reduction in target lesions. Finally, corresponding lymphocyte data highlight the benefit of replenishing and stimulating T cells continuously over the course of treatment with an I-O doublet regimen."

Bempegaldesleukin (NKTR-214, bempeg) is an investigational, CD122-preferential IL-2 pathway agonist designed to provide sustained signaling through the IL-2 beta-gamma receptor. PIVOT-02 is an ongoing Phase 2 study evaluating bempeg in combination with nivolumab in solid tumors.

119.     The above statements identified in ¶¶ 74-118 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects at the time they were made because the Individual Defendants failed to disclose that:  (1) Nektar and Bristol-Myers had decided to reduce the number of indications for which FDA approval would be sought; (2) the Company did not comply with current good manufacturing practices; (3) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (4) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (5) as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (6) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**The Truth Emerges**

120.     On August 8, 2019, after the market closed, the Company revealed that a manufacturing issue caused two batches of bempegaldesleukin to differ from the other twenty batches that were produced.  Moreover, these batches resulted in variable clinical benefit from other batches used in the Company's PIVOT-02 clinical trial.  The Company also revealed that it only had four active indications running with Bristol-Myers, and going forward, the collaboration with Bristol-Myers under the collocation agreement would focus only "on 5 or 6 key" indications, a significant narrowing of the collaboration, which had long been touted as involving 18 to 20 indications over nine tumor types.

121.     In a conference call held to discuss the Company's second quarter fiscal 2019 financial results, defendant Robin stated, in relevant part:

> At the recent ASCO 2019 meeting, we reported an update from the first-line melanoma cohort in PIVOT-02 that showed an improvement in complete response rates and deepening of responses for patients who responded to the doublet therapy, a clear benefit for these patients.  We recently announced that these compelling data led to a breakthrough designation from the FDA.

*     *     *

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

[W]e conducted a thorough characterization of all of the 22 lots of bempeg peg produced to-date, including all of those which currently supply and we'll supply our current and future registrational studies. ***The characterization work from these new assays revealed that two of the earliest production batches of bempeg were different than the other 20 batches produced.*** These two early manufacturing lots are known as lots two and five and the time of their production bidding beginning in 2016 it was early on in the manufacturing campaign and these lots were within the manufacturing controls and release specifications. As such, we did not detect any meaningful variability upon their release. Various early production batches of bempeg were sequentially distributed in PIVOT-02, lots one, two, three and five. As more clinical data matured and became available in PIVOT-02 and once we had identified the outlier variances of lots two and five, we then had the basis to start analyzing any potential differences between data from patients that started treatment with lots one and three as compared to lots two and five. ***We found notable correlations in several cohorts with evidence of an improved clinical benefit and patients who started treatment with lots one and three as compared to patients who started treatment with lots two and five.***

         \*   \*   \*

Let's just say this, if we get—if we—and I believe we will, have 6 major registrational trials running in 6 different indications with [Bristol-Myers], I do believe that's a good way to develop and focus development of bempeg. And I would expect that that's where we wind up. Clearly, at this point, running 20 trials is probably not the right thing to do in terms of how we use our resources. But I think if we identify, and I know we will, 5 or 6 very relevant, very significant registrational trials, I would expect that we can bring NKTR-214 and nivo to a very, very good result.

(Emphasis added).

122.   Defendant Robin added that the Company had "identified the cause of the physical differences between these lots, which we now know stemmed from a single sub-optimal batch of in-process intermediate that was used to produce only these 2 lots, lots 2 and 5 of the 22 lots we've made to date. The issue was restricted only to the single batch of intermediate used in lots 2 and 5[.]"

123.   The Company also revealed that it had withdrawn a presentation at the 2019 ESMO meeting with respect to first-line non-small cell lung cancer results, which it had promised on May 8, 2019, would be delivered at that meeting. The Company described that it was enrolling additional patients in the first-line non-small cell lung cancer cohorts, and "those patients are starting treatment with NKTR-214 lots that are not lots 2 and 5," suggesting that the study had been delayed while the manufacturing issue was resolved. Defendant Robin acknowledged that delays in its clinical collaboration with Bristol-Myers, which would include the delayed small lung cell results, was the

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

result of manufacturing issue by stating "we had to delay here because of these manufacturing lots that we recently correlated with clinical data."

124. On this news, the Company's share price fell $8.65, or nearly 30%, to close at $20.92 per share on August 9, 2019, on unusually heavy trading volume.

**The Director Defendants Issued Materially False**
**and Misleading Proxy Statements During the Relevant Period**

125. In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, certain of the Individual Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Period.

126. Defendants Robin, Winger, Chess, Whitfield, Greer, Kuebler, Lingnau, Robin, and Winger drafted, approved, reviewed, and/or signed a Form DEF14A before it was filed with the SEC and disseminated to Nektar's stockholders on May 1, 2017 (the "2017 Proxy"). Defendants Robin, Winger, Chess, Whitfield, Greer, Kuebler, Lingnau, Robin, and Winger negligently issued materially misleading statements in the 2017 Proxy. These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

127. The 2017 Proxy sought stockholder votes to, among others, elect defendants Robin and Winger and non-defendant Krivulka for a three-year term.

128. In support the their bid to reelect defendants Robin and Winger and non-defendant Krivulka, defendants Robin, Winger, Chess, Whitfield, Greer, Kuebler, Lingnau, Robin, and Winger highlighted their supposed oversight of the Company. In particular, the 2017 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Nektar faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. The 2017 Proxy stated:

The board of directors monitors and assesses key business risks directly through deliberations of the board of directors and also by way of delegation of certain risk oversight functions to be performed by committees of the board of directors. The board of directors regularly reviews and assesses, among other matters, the following important areas that present both opportunities and risk to the Company's business:

- Review and approval of the Company's annual operating and capital spending plan and review of management's updates as to the progress against the plan and any related risks and uncertainties.

- Periodic consideration of the balance of risk and opportunities presented by the Company's medium to long-term strategic plan and the potential implications of success and failure in one or more of the Company's key drug development programs.

- Regular consideration of the risks and uncertainties presented by alternative clinical development strategies.

- Periodic review and oversight of information technology (IT) risks and opportunities.

- Regular review of the progress and results of the Company's clinical development programs and early research efforts including but not limited to the strengths, weaknesses, opportunities and threats for these programs.

- Periodic review and oversight of material outstanding litigation or threatened litigation.

- Review and approval of material collaboration partnerships for the further development and commercial exploitation of the Company's proprietary drug development programs and technologies.

- Regular review and approval of the annual corporate goals and an assessment of the Company's level of achievement against these established goals.

- Regular review of the Company's financial position relative to the risk and opportunities for the Company's business.

- Periodic review of the Company's intellectual property estate.

- Periodic review and assessment of CEO succession planning.

- Periodic review of the Company's compensation programs.

The discussion above of risk oversight matters reviewed by the board of directors is intended to be illustrative only and not a complete list of all important matters reviewed and considered by the board of directors in providing oversight and direction for the Company's senior management and business.

The risk oversight function of the board of directors is also administered through various board committees. The Audit Committee oversees the management of financial, accounting, internal controls, disclosure controls and the engagement arrangement and regular oversight of the independent auditors. The Audit Committee

also periodically reviews the Company's investment policy for its cash reserves, corporate insurance policies, information technology infrastructure and general fraud monitoring practices and procedures, including the maintenance and monitoring of a whistleblower hotline and the segregation of duties and access controls across various functions. To assist the Audit Committee in its risk management oversight function, the internal auditor has a direct reporting relationship to the Audit Committee. The Company's internal audit function is focused on internal control monitoring and activities in support of the Audit Committee's risk oversight function.

*     *     *

### AUDIT COMMITTEE

The Audit Committee of the board of directors oversees our corporate accounting and financial reporting process. For this purpose, the Audit Committee performs several functions. The audit committee:

- evaluates the performance of and assesses the qualifications of our independent registered public accounting firm;

- determines whether to retain or terminate our independent registered public accounting firm or to appoint and engage a new independent registered public accounting firm;

- reviews and determines the engagement of the independent auditors, including the overall scope and plans for their respective audits, the adequacy of staffing and compensation, and negotiates and executes, on behalf of the Company, engagement letters with the independent auditors;

- establishes guidelines and procedures with respect to the rotation of the lead or coordinating audit partners having primary responsibility for the audit and the audit partner responsible for reviewing the audit;

- reviews and approves the retention of the independent registered public accounting firm for any permissible non-audit services and, at least annually, discusses with our independent registered public accounting firm, and reviews, that firm's independence;

- obtains and reviews, at least annually, a formal written statement prepared by the independent registered public accounting firm delineating all relationships between the independent registered public accounting firm and the Company and discusses with the independent registered public accounting firm, and reviews, its independence from management and the Company;

- reviews with the independent registered public accounting firm any management or internal control letter issued or, to the extent practicable, proposed to be issued by the independent registered public accounting firm and management's response;

- reviews with management and the independent registered public accounting firm the scope, adequacy and effectiveness of our financial reporting controls;

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

- reviews and discusses with management, the Company's risk management committee, the internal auditor and the independent registered public accounting firm, as appropriate, the Company's major financial risks, the Company's policies for assessment and management of such risks, and the steps to be taken to control such risks;

- reviews and evaluates the Company's information technology processes and risks;

- establishes and maintains procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, including procedures for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- investigates and resolves any disagreements between our management and the independent registered public accounting firm regarding our financial reporting, accounting practices or accounting policies and reviews with the independent registered public accounting firm any other problems or difficulties it may have encountered during the course of the audit work;

- meets with senior management and the independent registered public accounting firm in separate executive sessions;

- reviews the consolidated financial statements to be included in our quarterly reports on Form 10-Q and our annual reports on Form 10-K;

- discusses with management and the independent registered public accounting firm the results of the independent registered public accounting firm's review of our quarterly consolidated financial statements and the results of our annual audit and the disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our periodic reports;

- reviews and discusses with management and the independent registered public accounting firm any material financial arrangements of the Company which do not appear on the financial statements of the Company and any significant transactions or courses of dealing with parties related to the Company;

- reviews with management and the independent registered public accounting firm significant issues that arise regarding accounting principles and financial statement presentation;

- oversees the Company's internal audit function;

- discusses with management and the independent registered public accounting firm any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's consolidated financial statements, financial reporting process or accounting policies;

- oversees the preparation of the Audit Committee report to be included in the Company's annual report or proxy statement; and

50

- reviews the Company's investment policy for its cash reserves, corporate insurance policies, information technology infrastructure and general fraud monitoring practices and procedures, including the maintenance and monitoring of a whistleblower hotline and the segregation of duties and access controls across various functions.

With the passing away of Ms. Wang on March 8, 2016, the current members of the committee are Messrs. Greer, Krivulka, and Winger. Mr. Greer has been appointed as the Chairman of the audit committee. The board of directors annually reviews the NASDAQ listing standards definition of independence for audit committee members and has determined that all members of our audit committee are independent.

During the 2016 fiscal year, the board of directors determined that Mr. Greer qualified as an "audit committee financial expert" as defined in applicable SEC rules. The board of directors made a qualitative assessment of Mr. Greer's level of knowledge and experience based on a number of factors, including his formal education and experience as a Chief Executive Officer at a public reporting company, a Chief Financial Officer, and the chairman of public company audit committees. In addition to our audit committee, Mr. Greer also serves on the audit committee of Inogen, Inc. (NASDAQ: INGN) and Sientra, Inc. (NASDAQ: SIEN). The board of directors does not believe that such simultaneous service impairs Mr. Greer's ability to effectively serve as Chairman of our audit committee. The board of directors has also determined that Mr. Winger also qualifies as an "audit committee financial expert" as defined in applicable SEC rules. The board of directors made a qualitative assessment of Mr. Winger's level of knowledge and experience based on a number of factors, including his formal education and experience as a Chief Financial Officer of a public reporting company. In addition to our audit committee, Mr. Winger also serves on the audit committee of Accuray Incorporated (NASDAQ: ARAY). The board of directors does not believe that such simultaneous service impairs Mr. Winger's ability to effectively serve on our audit committee. The audit committee has adopted a written audit committee charter that is available on our corporate website at *www.nektar.com*.

\* \* \*

**CODE OF BUSINESS CONDUCT AND ETHICS**

We have adopted a code of business conduct and ethics that applies to all employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. The code of business conduct and ethics is available on our website at www.nektar.com. Amendments to, and waivers from, the code of business conduct and ethics that apply to any director, executive officer or persons performing similar functions will be disclosed at the website address provided above and, to the extent required by applicable regulations, on a Current Report on Form 8-K filed with the SEC.

\* \* \*

51

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

The audit committee is currently comprised of three non-employee directors, R. Scott Greer, the Chairman of the committee, Joseph J. Krivulka, and Dennis L. Winger. Susan Wang was the former chair of the committee.

Our board of directors determined that Ms. Wang met, and Messrs. Greer. Krivulka, and Winger meet the independence requirements set forth in Rule 10A-3(b)(1) under the Exchange Act and in the applicable NASDAQ rules. In addition, the board of directors determined that Ms. Wang qualified and Messrs. Greer and Winger qualify, as Audit Committee financial experts as defined by SEC rules. The Audit Committee has the responsibility and authority described in the Nektar Therapeutics Audit Committee Charter, which has been approved by the board of directors. A copy of the Audit Committee Charter is available on our website at www.nektar.com.

The Audit Committee is responsible for assessing the information provided by management and our independent registered public accounting firm in accordance with its business judgment. Management is responsible for the preparation, presentation and integrity of our financial statements and for the appropriateness of the accounting principles and reporting policies that are used. Management is also responsible for testing the system of internal controls and reports to the Audit Committee on any deficiencies found. Our independent registered public accounting firm, Ernst & Young LLP, is responsible for auditing the annual financial statements and for reviewing the unaudited interim financial statements.

In fulfilling its oversight responsibilities, the Audit Committee has reviewed and discussed the audited financial statements in the annual report on Form 10-K for the year ended December 31, 2018 with both management and our independent registered public accounting firm. The Audit Committee's review included a discussion of the quality and integrity of the accounting principles, the reasonableness of significant estimates and judgments and the clarity of disclosures in the financial statements.

The Audit Committee reviewed with our independent registered public accounting firm the overall scope and plan of the audit. In addition, it met with our independent registered public accounting firm, with and without management present, to discuss the results of our independent registered public accounting firm's examination, the evaluation of our system of internal controls, the overall quality of our financial reporting and such other matters as are required to be discussed under generally accepted accounting standards in the United States. The Audit Committee has also received from, and discussed with, our independent registered public accounting firm the matters required to be discussed by Auditing Standard No. 16, "*Communications with Audit Committees*" issued by the Public Company Accounting Oversight Board ("PCAOB").

The audit committee has discussed with Ernst & Young LLP that firm's independence from management and our Company, including the matters in the written disclosures and the letter regarding independence from Ernst & Young LLP required by applicable requirements of the PCAOB. The audit committee has also considered the compatibility of audit related and tax services with the auditors' independence. Based on its evaluation, the audit committee has selected Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2017.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors, and the board of directors approved, the

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

inclusion of the audited financial statements and management's assessment of the effectiveness of our internal controls over financial reporting in the annual report on Form 10-K for the year ended December 31, 2016 filed with the SEC.

129.    The 2017 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with Nektar's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner.  In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in:  (1) knowingly including outlier data that skewed the trial results; (2) claiming the data set consisted of ten patients, when it consisted of five; (3) falsely implying that NKTR-214 selectively proliferated cancer-killing cells in the same patients that experienced negligible increases of immunosuppressive cells, when those results occurred in different groups of patients; (4) stating that the dosing schedule was every 3 weeks, when a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (5) Nektar and Bristol-Myers had decided to reduce the number of indications for which FDA approval would be sought; (6) the Company did not comply with current good manufacturing practices; (7) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (8) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (9) as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (10) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

130.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to elect defendants Robin and Winger and non-defendant Krivulka.

131.    In addition, the 2017 Proxy sought a stockholder vote in connection with the 2017 Performance Incentive Plan (the "Plan").  As noted in the 2017 Proxy, the purpose of the Plan is to promote the success of the Company and to increase stockholder value by providing an additional means through the grant of awards to attract, motivate, retain and reward selected employees and

53
VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

1  other eligible persons. As noted by the Plan's title, the Plan was intended to provide performance-

2  based compensation, which it did in 2018, after obtaining the approval of Nektar's stockholders.

3       132.    As detailed above, in reality, the Individual Defendants were utterly failing in their

4  oversight duties by allowing the Company to operate with inadequate internal controls which

5  resulted in: (1) knowingly including outlier data that skewed the trial results; (2) claiming the data

6  set consisted of ten patients, when it consisted of five; (3) falsely implying that NKTR-214

7  selectively proliferated cancer-killing cells in the same patients that experienced negligible increases

8  of immunosuppressive cells, when those results occurred in different groups of patients; (4) stating

9  that the dosing schedule was every 3 weeks, when a 2-week dosing schedule was used for at least

10  two of the five dosed patients, including the outlier patient; (5) Nektar and Bristol-Myers had decided

11  to reduce the number of indications for which FDA approval would be sought; (6) the Company did

12  not comply with current good manufacturing practices; (7) as a result, batches of NKTR-214 were

13  not produced consistently and differed meaningfully; (8) clinical results from PIVOT-02 differed

14  based on the batch of NKTR-214 used in the study; (9) as a result, the PIVOT-02 study did not

15  produce statistically significant results to support a finding of clinical benefit; and (10) as a result of

16  the foregoing, the Individual Defendants' positive statements about the Company's business,

17  operations, and prospects were materially misleading and/or lacked a reasonable basis. All of this

18  led to the granting of performance awards which would not have been granted had the public known

19  about the Individual Defendants misstatements.

20       133.    Moreover, had the Nektar stockholders been fully informed about the true operations

21  at Nektar, including the misstatements concerning NKTR-214 and its studies, they would not have

22  voted to approve the Plan. The adoption of the Plan helped to perpetuate the deceit and wrongdoing

23  and violations of law at Nektar by providing additional compensation to key executives at the

24  Company which were tied to performance goals which were only being achieved as a result of the

25  Individual Defendants false and misleading statements.

26       134.    Defendants Robin, Ajer, Chess, Whitfield, Greer, Kuebler, Lingnau, and Winger

27  drafted, approved, reviewed, and/or signed a Form DEF14A before it was filed with the SEC and

28

disseminated to Nektar's stockholders on April 30, 2018 (the "2018 Proxy"). The Director Defendants negligently issued materially misleading statements in the 2018 Proxy. These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

135. The 2018 Proxy sought stockholder votes to, among others, elect defendants Ajer, Chess, and Whitfield for a three-year term.

136. In support of their bid to reelect defendants Greer and Lingnau, defendants Robin, Ajer, Chess, Whitfield, Greer, Kuebler, Lingnau, and Winger highlighted their supposed oversight of the Company. In particular, the 2018 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Nektar faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. The 2018 Proxy stated:

> The board of directors monitors and assesses key business risks directly through deliberations of the board of directors and also by way of delegation of certain risk oversight functions to be performed by committees of the board of directors. The board of directors regularly reviews and assesses, among other matters, the following important areas that present both opportunities and risk to the Company's business:
>
> - Review and approval of the Company's annual operating and capital spending plan and review of management's updates as to the progress against the plan and any related risks and uncertainties.
>
> - Periodic consideration of the balance of risk and opportunities presented by the Company's medium to long-term strategic plan and the potential implications of success and failure in one or more of the Company's key drug development programs.
>
> - Regular consideration of the risks and uncertainties presented by alternative clinical development strategies.
>
> - Periodic review and oversight of information technology (IT) risks and opportunities.

- Regular review of the progress and results of the Company's clinical development programs and early research efforts including but not limited to the strengths, weaknesses, opportunities and threats for these programs.

- Periodic review and oversight of material outstanding litigation or threatened litigation.

- Review and approval of material collaboration partnerships for the further development and commercial exploitation of the Company's proprietary drug development programs and technologies.

- Regular review and approval of the annual corporate goals and an assessment of the Company's level of achievement against these established goals.

- Regular review of the Company's financial position relative to the risk and opportunities for the Company's business.

- Periodic review of the Company's intellectual property estate.

- Periodic review and assessment of CEO succession planning.

- Periodic review of the Company's compensation programs.

The discussion above of risk oversight matters reviewed by the board of directors is intended to be illustrative only and not a complete list of all important matters reviewed and considered by the board of directors in providing oversight and direction for the Company's senior management and business.

The risk oversight function of the board of directors is also administered through various board committees. The Audit Committee oversees the management of financial, accounting, internal controls, disclosure controls and the engagement arrangement and regular oversight of the independent auditors. The Audit Committee also periodically reviews the Company's investment policy for its cash reserves, corporate insurance policies, information technology infrastructure and general fraud monitoring practices and procedures, including the maintenance and monitoring of a whistleblower hotline and the segregation of duties and access controls across various functions. To assist the Audit Committee in its risk management oversight function, the internal auditor has a direct reporting relationship to the Audit Committee. The Company's internal audit function is focused on internal control monitoring and activities in support of the Audit Committee's risk oversight function.

\*       \*       \*

***AUDIT COMMITTEE***

The Audit Committee of the board of directors oversees our corporate accounting and financial reporting process. For this purpose, the Audit Committee performs several functions. The Audit Committee:

- evaluates the performance of and assesses the qualifications of our independent registered public accounting firm;

- determines whether to retain or terminate our independent registered public accounting firm or to appoint and engage a new independent registered public accounting firm;

- reviews and determines the engagement of the independent auditors, including the overall scope and plans for their respective audits, the adequacy of staffing and compensation, and negotiates and executes, on behalf of the Company, engagement letters with the independent auditors;

- establishes guidelines and procedures with respect to the rotation of the lead or coordinating audit partners having primary responsibility for the audit and the audit partner responsible for reviewing the audit;

- reviews and approves the retention of the independent registered public accounting firm for any permissible non-audit services and, at least annually, discusses with our independent registered public accounting firm, and reviews, that firm's independence;

- obtains and reviews, at least annually, a formal written statement prepared by the independent registered public accounting firm delineating all relationships between the independent registered public accounting firm and the Company and discusses with the independent registered public accounting firm, and reviews, its independence from management and the Company;

- reviews with the independent registered public accounting firm any management or internal control letter issued or, to the extent practicable, proposed to be issued by the independent registered public accounting firm and management's response;

- reviews with management and the independent registered public accounting firm the scope, adequacy and effectiveness of our financial reporting controls;

- reviews and discusses with management, the Company's risk management committee, the internal auditor and the independent registered public accounting firm, as appropriate, the Company's major financial risks, the Company's policies for assessment and management of such risks, and the steps to be taken to control such risks;

- reviews and evaluates the Company's information technology processes and risks;

- establishes and maintains procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, including procedures for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- investigates and resolves any disagreements between our management and the independent registered public accounting firm regarding our financial reporting, accounting practices or accounting policies and reviews with the independent registered public accounting firm any other problems or difficulties it may have encountered during the course of the audit work;

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

- meets with senior management and the independent registered public accounting firm in separate executive sessions;

- reviews the consolidated financial statements to be included in our quarterly reports on Form 10-Q and our annual reports on Form 10-K;

- discusses with management and the independent registered public accounting firm the results of the independent registered public accounting firm's review of our quarterly consolidated financial statements and the results of our annual audit and the disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our periodic reports;

- reviews and discusses with management and the independent registered public accounting firm any material financial arrangements of the Company which do not appear on the financial statements of the Company and any significant transactions or courses of dealing with parties related to the Company;

- reviews with management and the independent registered public accounting firm significant issues that arise regarding accounting principles and financial statement presentation;

- oversees the Company's internal audit function;

- discusses with management and the independent registered public accounting firm any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's consolidated financial statements, financial reporting process or accounting policies;

- oversees the preparation of the Audit Committee report to be included in the Company's annual report or proxy statement; and

- reviews the Company's investment policy for its cash reserves, corporate insurance policies, information technology infrastructure and general fraud monitoring practices and procedures, including the maintenance and monitoring of a whistleblower hotline and the segregation of duties and access controls across various functions.

The audit committee has the authority to retain special legal, accounting or other professional advisors to advise the committee as it deems necessary, at our expense, to carry out its duties and to determine the compensation of any such advisors.

With the passing away of Mr. Krivulka on February 17, 2018, the current members of the committee are Messrs. Ajer, Greer, Whitfield, and Winger. Mr. Greer serves as the Chairman of the audit committee. The board of directors annually reviews the NASDAQ listing standards definition of independence for audit committee members and has determined that all members of our audit committee are independent.

During the 2017 fiscal year, the board of directors determined that Mr. Greer qualified as an "audit committee financial expert" as defined in applicable SEC rules. The board of directors made a qualitative assessment of Mr. Greer's level of

knowledge and experience based on a number of factors, including his formal education and experience as a Chief Executive Officer at a public reporting company, a Chief Financial Officer, and the chairman of public company audit committees. In addition to our audit committee, Mr. Greer also serves as the chair of the audit committee of Inogen, Inc. (NASDAQ: INGN). The board of directors does not believe that such simultaneous service impairs Mr. Greer's ability to effectively serve as Chairman of our audit committee. The board of directors has also determined that Mr. Winger also qualifies as an "audit committee financial expert" as defined in applicable SEC rules. The board of directors made a qualitative assessment of Mr. Winger's level of knowledge and experience based on a number of factors, including his formal education and experience as a Chief Financial Officer of a public reporting company. In addition to our audit committee, Mr. Winger also serves on the audit committee of Accuray Incorporated (NASDAQ: ARAY). The board of directors does not believe that such simultaneous service impairs Mr. Winger's ability to effectively serve on our audit committee. The audit committee has adopted a written audit committee charter that is available on our corporate website at *www.nektar.com*.

*       *       *

## CODE OF BUSINESS CONDUCT AND ETHICS

We have adopted a code of business conduct and ethics that applies to all employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions.  The code of business conduct and ethics is available on our website at www.nektar.com. Amendments to, and waivers from, the code of business conduct and ethics that apply to any director, executive officer or persons performing similar functions will be disclosed at the website address provided above and, to the extent required by applicable regulations, on a Current Report on Form 8-K filed with the SEC.

*       *       *

The audit committee is currently comprised of four non-employee directors, R. Scott Greer, the Chairman of the committee, Jeff Ajer, Roy A. Whitfield, and Dennis L. Winger. Mr. Krivulka was a member of the audit committee until his passing on February 17, 2018.  Dennis L. Winger had been a member of the Audit Committee until his retirement on September 26, 2018.  Our board of directors determined that Messrs. Greer, Ajer, Whitfield and Winger meet the independence requirements set forth in Rule 10A-3(b)(1) under the Exchange Act and in the applicable NASDAQ rules. In addition, the board of directors determined that Mr. Krivulka qualified and Messrs. Greer and Winger Whitfield qualify as audit committee financial experts as defined by SEC rules. The audit committee has the responsibility and authority described in the Nektar Therapeutics Audit Committee Charter, which has been approved by the board of directors. A copy of the Audit Committee Charter is available on our website at www.nektar.com.

The Audit Committee is responsible for assessing the information provided by management and our independent registered public accounting firm in accordance with its business judgment.   Management is responsible for the preparation, presentation and integrity of our financial statements and for the appropriateness of the accounting principles and reporting policies that are used.  Management is also responsible for testing the system of internal controls and reports to the Audit Committee on any deficiencies found.  Our independent registered public accounting

firm, Ernst & Young LLP, is responsible for auditing the annual financial statements and for reviewing the unaudited interim financial statements.

In fulfilling its oversight responsibilities, the audit committee has reviewed and discussed the audited financial statements in the annual report on Form 10-K for the year ended December 31, 2017 with both management and our independent registered public accounting firm. The audit committee's review included a discussion of the quality and integrity of the accounting principles, the reasonableness of significant estimates and judgments and the clarity of disclosures in the financial statements.

The Audit Committee reviewed with our independent registered public accounting firm the overall scope and plan of the audit. In addition, it met with our independent registered public accounting firm, with and without management present, to discuss the results of our independent registered public accounting firm's examination, the evaluation of our system of internal controls, the overall quality of our financial reporting and such other matters as are required to be discussed under generally accepted accounting standards in the United States. The Audit Committee has also received from, and discussed with, our independent registered public accounting firm the matters required to be discussed by Auditing Standard No. 16, "*Communications with Audit Committees*" issued by the Public Company Accounting Oversight Board ("PCAOB").

The audit committee has discussed with Ernst & Young LLP that firm's independence from management and our Company, including the matters in the written disclosures and the letter regarding independence from Ernst & Young LLP required by applicable requirements of the PCAOB. The audit committee has also considered the compatibility of audit related and tax services with the auditors' independence. Based on its evaluation, the audit committee has selected Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2018.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors, and the board of directors approved, the inclusion of the audited financial statements and management's assessment of the effectiveness of our internal controls over financial reporting in the annual report on Form 10-K for the year ended December 31, 2017 filed with the SEC.

137. The 2018 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with Nektar's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner. In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in: (1) knowingly including outlier data that skewed the trial results; (2) claiming the data set consisted of ten patients, when it consisted of five; (3) falsely implying that NKTR-214 selectively proliferated cancer-killing cells in the same patients that experienced negligible increases of immunosuppressive cells, when

those results occurred in different groups of patients; (4) stating that the dosing schedule was every 3 weeks, when a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (5) Nektar and Bristol-Myers had decided to reduce the number of indications for which FDA approval would be sought; (6) the Company did not comply with current good manufacturing practices; (7) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (8) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (9) as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (10) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

138.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Ajer, Chess, and Whitfield.

139.    Defendants Eastham, Robin, Ajer, Chess, Whitfield, Greer, and Lingnau drafted, approved, reviewed, and/or signed a Form DEF14A before it was filed with the SEC and disseminated to Nektar's stockholders on April 30, 2019 (the "2019 Proxy"). Defendants Eastham, Robin, Ajer, Chess, Whitfield, Greer, and Lingnau negligently issued materially misleading statements in the 2019 Proxy. These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

140.    The 2019 Proxy sought stockholder votes to, among others, elect defendants Greer and Lingnau for a three-year term.

141.    In support of their bid to reelect defendants Greer and Lingnau, defendants Eastham, Robin, Ajer, Chess, Whitfield, Greer, and Lingnau highlighted their supposed oversight of the Company. In particular, the 2019 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Nektar faces, including legal and regulatory risks,

financial controls, and risks associated with compensation programs and plans. The 2019 Proxy stated:

The board of directors monitors and assesses key business risks directly through deliberations of the board of directors and also by way of delegation of certain risk oversight functions to be performed by committees of the board of directors. The board of directors regularly reviews and assesses, among other matters, the following important areas that present both opportunities and risk to the Company's business:

- Review and approval of the Company's annual operating and capital spending plan and review of management's updates as to the progress against the plan and any related risks and uncertainties.

- Periodic consideration of the balance of risk and opportunities presented by the Company's medium to long-term strategic plan and the potential implications of success and failure in one or more of the Company's key drug development programs.

- Regular consideration of the risks and uncertainties presented by alternative clinical development strategies.

- Periodic review and oversight of information technology (IT) risks and opportunities.

- Regular review of the progress and results of the Company's clinical development programs and early research efforts including but not limited to the strengths, weaknesses, opportunities and threats for these programs.

- Periodic review and oversight of material outstanding litigation or threatened litigation.

- Review and approval of material collaboration partnerships for the further development and commercial exploitation of the Company's proprietary drug development programs and technologies.

- Regular review and approval of the annual corporate goals and an assessment of the Company's level of achievement against these established goals.

- Regular review of the Company's financial position relative to the risk and opportunities for the Company's business.

- Periodic review of the Company's intellectual property estate.

- Periodic review and assessment of CEO succession planning.

- Periodic review of the Company's compensation programs.

The discussion above of risk oversight matters reviewed by the board of directors is intended to be illustrative only and not a complete list of all important matters reviewed and considered by the board of directors in providing oversight and direction for the Company's senior management and business.

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

The risk oversight function of the board of directors is also administered through various board committees. The Audit Committee oversees the management of financial, accounting, internal controls, disclosure controls and the engagement arrangement and regular oversight of the independent auditors. The Audit Committee also periodically reviews the Company's investment policy for its cash reserves, corporate insurance policies, information technology infrastructure and general fraud monitoring practices and procedures, including the maintenance and monitoring of a whistleblower hotline and the segregation of duties and access controls across various functions. To assist the Audit Committee in its risk management oversight function, the internal auditor has a direct reporting relationship to the Audit Committee. The Company's internal audit function is focused on internal control monitoring and activities in support of the Audit Committee's risk oversight function.

*       *       *

*AUDIT COMMITTEE*

The Audit Committee of the board of directors oversees our corporate accounting and financial reporting process. For this purpose, the Audit Committee performs several functions. The Audit Committee:

- evaluates the performance of and assesses the qualifications of our independent registered public accounting firm;

- determines whether to retain or terminate our independent registered public accounting firm or to appoint and engage a new independent registered public accounting firm;

- reviews and determines the engagement of the independent auditors, including the overall scope and plans for their respective audits, the adequacy of staffing and compensation, and negotiates and executes, on behalf of the Company, engagement letters with the independent auditors;

- establishes guidelines and procedures with respect to the rotation of the lead or coordinating audit partners having primary responsibility for the audit and the audit partner responsible for reviewing the audit;

- reviews and approves the retention of the independent registered public accounting firm for any permissible non-audit services and, at least annually, discusses with our independent registered public accounting firm, and reviews, that firm's independence;

- obtains and reviews, at least annually, a formal written statement prepared by the independent registered public accounting firm delineating all relationships between the independent registered public accounting firm and the Company and discusses with the independent registered public accounting firm, and reviews, its independence from management and the Company;

- reviews with the independent registered public accounting firm any management or internal control letter issued or, to the extent practicable, proposed to be issued by the independent registered public accounting firm and management's response;

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

- reviews with management and the independent registered public accounting firm the scope, adequacy and effectiveness of our financial reporting controls;

- reviews and discusses with management, the Company's risk management committee, the internal auditor and the independent registered public accounting firm, as appropriate, the Company's major financial risks, the Company's policies for assessment and management of such risks, and the steps to be taken to control such risks;

- reviews and evaluates the Company's information technology processes and risks;

- establishes and maintains procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, including procedures for the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- investigates and resolves any disagreements between our management and the independent registered public accounting firm regarding our financial reporting, accounting practices or accounting policies and reviews with the independent registered public accounting firm any other problems or difficulties it may have encountered during the course of the audit work;

- meets with senior management and the independent registered public accounting firm in separate executive sessions;

- reviews the consolidated financial statements to be included in our quarterly reports on Form 10-Q and our annual reports on Form 10-K;

- discusses with management and the independent registered public accounting firm the results of the independent registered public accounting firm's review of our quarterly consolidated financial statements and the results of our annual audit and the disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our periodic reports;

- reviews and discusses with management and the independent registered public accounting firm any material financial arrangements of the Company which do not appear on the financial statements of the Company and any significant transactions or courses of dealing with parties related to the Company;

- reviews with management and the independent registered public accounting firm significant issues that arise regarding accounting principles and financial statement presentation;

- oversees the Company's internal audit function;

- discusses with management and the independent registered public accounting firm any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues

regarding the Company's consolidated financial statements, financial reporting process or accounting policies;

- oversees the preparation of the Audit Committee report to be included in the Company's annual report or proxy statement; and

- reviews the Company's investment policy for its cash reserves, corporate insurance policies, information technology infrastructure and general fraud monitoring practices and procedures, including the maintenance and monitoring of a whistleblower hotline and the segregation of duties and access controls across various functions.

With the passing away of Mr. Krivulka on February 17, 2018 and the retirement of Mr. Winger effective as of September 26, 2018, the current members of the committee are Messrs. Ajer, Greer and Whitfield and Ms. Eastham, who was appointed to the committee effective as of September 26, 2018. Mr. Greer serves as the Chairman of the Audit Committee. The board of directors annually reviews the NASDAQ listing standards definition of independence for Audit Committee members and has determined that all members of our Audit Committee are independent.

During the 2018 fiscal year, the board of directors determined that Mr. Greer qualified as an "Audit Committee financial expert" as defined in applicable SEC rules. The board of directors made a qualitative assessment of Mr. Greer's level of knowledge and experience based on a number of factors, including his formal education and experience as a Chief Executive Officer at a public reporting company, a Chief Financial Officer, and the chairman of public company Audit Committees. In addition to our Audit Committee, Mr. Greer also serves as the chair of the Audit Committee of Inogen, Inc. (NASDAQ: INGN). The board of directors does not believe that such simultaneous service impairs Mr. Greer's ability to effectively serve as Chairman of our Audit Committee. The board of directors has also determined that Ms. Eastham also qualifies as an "Audit Committee financial expert" as defined in applicable SEC rules. The board of directors made a qualitative assessment of Ms. Eastham's level of knowledge and experience based on a number of factors, including her formal education and experience as a Chief Financial Officer of a public reporting company. In addition to our Audit Committee, Ms. Eastham also serves on the Audit Committees of Illumina, Inc. (NASDAQ: ILMN), Geron Corporation (NASDAQ: GERN) and Veracyte, Inc. (NASDAQ: VCYT). The board of directors does not believe that such simultaneous service impairs Ms. Eastham's ability to effectively serve on our Audit Committee. The Audit Committee has adopted a written Audit Committee charter that is available on our corporate website at *www.nektar.com*.

*       *       *

CODE OF BUSINESS CONDUCT AND ETHICS

We have adopted a code of business conduct and ethics that applies to all employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions. The code of business conduct and ethics is available on our website at www.nektar.com. Amendments to, and waivers from, the code of business conduct and ethics that apply to any director, executive officer or persons performing similar functions will be

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

disclosed at the website address provided above and, to the extent required by applicable regulations, on a Current Report on Form 8-K filed with the SEC.

\* \* \*

The Audit Committee is currently comprised of four non-employee directors, R. Scott Greer, the Chairman of the committee, Jeff Ajer, Karin Eastham and Roy A. Whitfield. Joseph J. Krivulka had been a member of the Audit Committee until his passing on February 17, 2018. Dennis L. Winger had been a member of the Audit Committee until his retirement on September 26, 2018. Our board of directors determined that Messrs. Greer, Ajer and Whitfield and Ms. Eastham meet the independence requirements set forth in Rule 10A-3(b)(1) under the Exchange Act and in the applicable NASDAQ rules. In addition, the board of directors determined that Messrs. Krivulka and Winger qualified, and Mr. Greer and Ms. Eastham qualify, as Audit Committee financial experts as defined by SEC rules. The Audit Committee has the responsibility and authority described in the Nektar Therapeutics Audit Committee Charter, which has been approved by the board of directors. A copy of the Audit Committee Charter is available on our website at www.nektar.com.

The Audit Committee is responsible for assessing the information provided by management and our independent registered public accounting firm in accordance with its business judgment. Management is responsible for the preparation, presentation and integrity of our financial statements and for the appropriateness of the accounting principles and reporting policies that are used. Management is also responsible for testing the system of internal controls and reports to the Audit Committee on any deficiencies found. Our independent registered public accounting firm, Ernst & Young LLP, is responsible for auditing the annual financial statements and for reviewing the unaudited interim financial statements.

In fulfilling its oversight responsibilities, the Audit Committee has reviewed and discussed the audited financial statements in the annual report on Form 10-K for the year ended December 31, 2018 with both management and our independent registered public accounting firm. The Audit Committee's review included a discussion of the quality and integrity of the accounting principles, the reasonableness of significant estimates and judgments and the clarity of disclosures in the financial statements.

The Audit Committee reviewed with our independent registered public accounting firm the overall scope and plan of the audit. In addition, it met with our independent registered public accounting firm, with and without management present, to discuss the results of our independent registered public accounting firm's examination, the evaluation of our system of internal controls, the overall quality of our financial reporting and such other matters as are required to be discussed under generally accepted accounting standards in the United States. The Audit Committee has also received from, and discussed with, our independent registered public accounting firm the matters required to be discussed by Auditing Standard No. 16, "*Communications with Audit Committees*" issued by the Public Company Accounting Oversight Board ("PCAOB").

The Audit Committee has discussed with Ernst & Young LLP that firm's independence from management and our Company, including the matters in the written disclosures and the letter regarding independence from Ernst & Young LLP required by applicable requirements of the PCAOB. The Audit Committee has also considered the compatibility of audit related and tax services with the auditors'

independence. Based on its evaluation, the Audit Committee has selected Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2019.

In reliance on the reviews and discussions referred to above, the Audit Committee recommended to the board of directors, and the board of directors approved, the inclusion of the audited financial statements and management's assessment of the effectiveness of our internal controls over financial reporting in the annual report on Form 10-K for the year ended December 31, 2018 filed with the SEC.

142. The 2019 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with Nektar's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner. In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in: (1) knowingly including outlier data that skewed the trial results; (2) claiming the data set consisted of ten patients, when it consisted of five; (3) falsely implying that NKTR-214 selectively proliferated cancer-killing cells in the same patients that experienced negligible increases of immunosuppressive cells, when those results occurred in different groups of patients; (4) stating that the dosing schedule was every 3 weeks, when a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (5) Nektar and Bristol-Myers had decided to reduce the number of indications for which FDA approval would be sought; (6) the Company did not comply with current good manufacturing practices; (7) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (8) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (9) as a result, the PIVOT-02 study did not produce statistically significant results to support a finding of clinical benefit; and (10) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

143. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Greer and Lingnau.

**The Insider Selling Defendants Sold Substantial Shares of Nektar Stock While**
**in Possession of Material, Adverse, Information Regarding the Company's Business**

144.    During the Relevant Period, certain of the Individual Defendants—specifically, the Insider Selling Defendants—engaged in numerous sales of Nektar common stock while in possession of material information that was adverse to Nektar's business.

145.    In particular, the Insider Selling Defendants sold a total of more than $158.7 million in Nektar common stock during the Relevant Period.

146.    In making the insider trades, the Insider Selling Defendants were able to unjustly profit from artificially high trading levels stemming from the Individual Defendants' concerted false and misleading statements disseminated to the market.

## DAMAGES TO THE COMPANY

147.    As a result of the Individual Defendants' wrongful conduct, Nektar disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Nektar's credibility.  Nektar has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

148.    Moreover, the actions of the Individual Defendants in directing Nektar to undertake illicit sales practices have exposed Nektar to civil and criminal liability and are not protected by the business judgment rule.

149.    Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Actions in addition to potential fines from the U.S. regulators regarding the Company's illicit sales practices.

150.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Nektar's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

151.    Moreover, these actions have irreparably damaged Nektar's corporate image and goodwill.  For at least the foreseeable future, Nektar will suffer from what is known as the "liar's

discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Nektar's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### DERIVATIVE AND DEMAND ALLEGATIONS

152. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

153. Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

154. Plaintiffs are owners of Nektar common stock and are owners of Nektar common stock at all times relevant hereto. As a result of the facts set forth herein, Plaintiffs have not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

155. At the time this action was commenced, Nektar's Board consisted of the Director Defendants. These directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute the action, and therefore demand is futile, for the following reasons:

A. The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The current members of the Board were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate;

B. Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard allowed Nektar to partake in illicit sales practices and reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices;

C. The Director Defendants knowingly and/or recklessly authorized false and misleading statements, failed to timely correct such statements, failed to take

necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Nektar to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to the Director Defendants;

D. As noted above, the Insider Selling Defendants personally benefited from Nektar's materially false and misleading statements made by the Individual Defendants by having an opportunity to sell shares of Nektar stock at artificially inflated prices, a benefit not shared by Nektar's public stockholders. Accordingly, demand is futile as to defendants Robin, Ajer, Chess, Greer, and Lingau;

E. Defendant Robin is not disinterested for purposes of demand futility because his principal occupation is serving as Nektar's CEO. As such, the 2019 Proxy filed with the SEC explicitly states that Robin is not independent. Further, according to the Company's SEC filings, in 2018, Robin received total compensation of $13,330,667. This amount is material to him. Moreover, defendant Robin is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Actions;

F. As members of the Audit Committee during the Relevant Period, defendants Greer, Ajer, Eastham, and Whitfield participated in and knowingly approved Nektar's illicit sales practices and filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public. More specifically, as members of the Audit Committee, defendants Anderson, McFarland, and Greer were obligated to oversee and monitor the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements. Instead, defendants Anderson, McFarland, and Greer, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and compliance with legal and regulatory requirements, as required by the Audit Committee Charter. For this reason, demand is futile as to defendants Greer, Ajer, Eastham, and Whitfield;

G. Demand is excused as to defendant Chess for additional reasons because he has served in a variety of positions at Nektar throughout his years with the Company. From March 2006 to January 2007 he was the acting President and CEO; from April 1999-January 2007 he was the Executive Chairman; from April 1998 to April 2000, he was Co-CEO; from December 1991 to August 1998 he served as President; and from May 1992 to August 1998, he served as the Company's CEO. Defendant Chess receives handsome compensation, including $741,551 during the fiscal year ended December 31, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets; and

H. Demand is excused as to defendants Greer, Robin, and Lingnau because of their overlapping business affiliations. Due to their close relationships, and conflicts of

interests arising therefrom, defendants Greer, Robin, and Lingnau, cannot take the necessary and proper steps to investigate and remedy the Individual Defendants' wrongdoing. Defendants Greer, Robin, and Lingnau are incapable of independently and impartially consider a demand to commence and vigorously prosecute this action.

a.      First, defendants Greer, Lingnau, and Robin served on the board of Sirna Therapeutics, Inc. at the same time. Defendant Greer served as a member of the board of directors of Sirna Therapeutics, Inc., a biotechnology company, from 2003, and as its chairman of the board of directors from 2005 through the closing of the acquisition of Sirna by Merck & Co., Inc. in December 2006.

b.      Defendant Lingnau was a member of the board of directors of Sirna Therapeutics, Inc., a biotechnology company, from February 2006 through the closing of the acquisition of Sirna by Merck & Co., Inc. in December 2006.

c.      Robin served as CEO, President, and a director of Sirna Therapeutics, Inc., a biotechnology company, from July 2001 to November 2006 and from January 2001 to June 2001, served as their Chief Operating Officer, President, and as a director.

d.      Second, defendants Lingnau and Robin were colleagues at Schering, AG and Berlex Laboratories, Inc. Defendant Lingnau retired from Schering AG Group, Germany, in December 2005 as a member of Schering AG's Executive Board and as Vice Chairman, President and Chief Executive Officer of Schering Berlin, Inc., a United States subsidiary. Prior to his retirement, Mr. Lingnau was responsible for Schering AG's worldwide specialized therapeutics and dermatology businesses. He joined Schering AG's business trainee program in 1966. Throughout his career at Schering AG, defendant Lingnau served in various capacities and in a number of subsidiaries in South America and the United States, including his roles as President of Berlex Laboratories, Inc., from 1983 to 1985, as the Head of Worldwide Sales and Marketing in the Pharmaceutical Division of Schering AG, from 1985 to 1989, and as Chairman of Berlex Laboratories, Inc. from 1985 to 2005.

e.      Defendant Robin was Corporate Vice President and General Manager at Berlex Laboratories, Inc., a pharmaceutical products company that is a subsidiary of Schering, AG from 1991 to 2001. From 1987 to 1991 he served as Vice President of Finance and Business Development and Chief Financial Officer. From 1984 to 1987, Robin was Director of Business Planning and Development at Berlex.

f.      Due to their long-standing professional and personal ties with each other defendants Greer, Lingnau, and Robin are incapable of impartially considering a demand to commence and vigorously prosecute this action, and, thus, the demand upon them is excused.

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

**COUNT I**
**Against the Individual Defendants**
**for Breach of Fiduciary Duty**

156.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

157.     Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nektar's business and affairs.

158.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

159.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Nektar.

160.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

161.     The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the illicit sales practices in violation of U.S. law.

162.     In addition, the Individual Defendants further breached their fiduciary duties owed to Nektar by: (1) knowingly including outlier data that skewed the trial results; (2) claiming the data set consisted of ten patients, when it consisted of five; (3) falsely implying that NKTR-214 selectively proliferated cancer-killing cells in the same patients that experienced negligible increases of immunosuppressive cells, when those results occurred in different groups of patients; (4) stating that the dosing schedule was every 3 weeks, when a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (5) Nektar and Bristol-Myers had decided to reduce the number of indications for which FDA approval would be sought; (6) the Company did not comply with current good manufacturing practices; (7) as a result, batches of NKTR-214 were not produced consistently and differed meaningfully; (8) clinical results from PIVOT-02 differed based on the batch of NKTR-214 used in the study; (9) as a result, the PIVOT-

02 study did not produce statistically significant results to support a finding of clinical benefit; and (10) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

163. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

164. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

165. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

166. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nektar has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

167. Plaintiffs on behalf of Nektar have no adequate remedy at law.

**COUNT II**
**Against the Director Defendants for Violation of**
**Section 14(a) of the Exchange Act**

168.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

169.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The Section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiffs specifically disclaim any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

170.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2017 Proxy, the 2018 Proxy, and the 2019 Proxy.  In the 2017 Proxy, the 2018 Proxy, and the 2019 Proxy, the Board solicited stockholder votes to reelect the certain of the Individual Defendants to the Board.   In addition, the 2017 Proxy sought a stockholder vote on the Company's 2017 Performance Incentive Plan.

171.    The 2017 Proxy, the 2018 Proxy, and the 2019 Proxy, however, misrepresented and failed to disclose, among others, the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the conduct alleged herein, the Director Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Nektar misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect certain of the Individual Defendants.

172.    Plaintiffs, on behalf of Nektar, thereby seek relief for damages inflicted upon the Company based upon the misleading 2017 Proxy, 2018 Proxy, and 2019 Proxy in connection with the improper reelection of certain of the Individual Defendants.

**COUNT III**
**Against the Insider Selling Defendants for**
**Insider Selling and Misappropriation of Information**

173. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

174. At the time each of the Insider Selling Defendants sold his or her Nektar stock, he or she knew the material, non-public information described above, and sold Nektar stock on the basis of such information.

175. The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects. It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in Nektar stock. Each of the Insider Selling Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Nektar stock.

176. The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith. Each of the Insider Selling Defendants is therefore liable to Nektar for insider trading.

177. Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

178. Plaintiffs, on behalf of Nektar, have no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

A. Declaring that Plaintiffs may maintain this derivative action on behalf of Nektar and that Plaintiffs are proper and adequate representatives of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.      Ordering the Insider Selling Defendants to disgorge the profits obtained as a result of their sale of Nektar stock while in possession of insider information as described herein;

D.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

DATED:  July 1, 2020                                    Respectfully submitted,

                                                        **BRAGAR EAGEL & SQUIRE, P.C.**

                                                        */s/ W. Scott Holleman*
                                                        W. Scott Holleman (#310266)
                                                        Melissa A. Fortunato (#319767)
                                                        580 California Street, Suite 1200
                                                        San Francisco, California 94104
                                                        Telephone: (415) 568-3599
                                                        Email: holleman@bespc.com
                                                                fortunato@bespc.com

OF COUNSEL:

HYNES & HERNANDEZ, LLC
Michael J. Hynes
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-9273

*Attorneys for Plaintiffs*

VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Allison Hunt, hereby verify that I have authorized the filing of the attached

Verified Consolidated Stockholder Derivative Complaint, that I have reviewed the Verified

Consolidated Stockholder Derivative Complaint and that the facts therein are true and correct to

the best of my knowledge, information and belief. I declare under penalty of perjury that the

foregoing is true

and correct.

June __30__, 2020

*Allison Hunt*
Allison Hunt (Jun 30, 2020 13:33 EDT)
_____
Allison Hunt

**VERIFICATION**

I, Gail Becker, hereby verify that I have authorized the filing of the attached

Verified Consolidated Stockholder Derivative Complaint, that I have reviewed the Verified

Consolidated Stockholder Derivative Complaint and that the facts therein are true and correct to

the best of my knowledge, information and belief. I declare under penalty of perjury that the

foregoing is true

and correct.

June __30__, 2020

*Gail Becker*
Gail Becker (Jun 30, 2020 15:05 EDT)
Gail Becker